RYAN TYZ (CSB No. 234895)
ryan@tyzlaw.com
ERIN JONES (CSB No. 252947)
ejones@tyzlaw.com
UDIT SOOD (CSB No. 308476)
udit@tyzlaw.com
XIAOYUAN ZHANG (CSB No. 339375)
xiaoyuan@tyzlaw.com
MONICA CHINCHILLA (CSB No. 358283)
monica@tyzlaw.com
TYZ LAW GROUP PC
4 Embarcadero Center, 14th Floor
San Francisco, CA 94111
Telephone: 415.868.6900

Attorneys for Plaintiff
Flexport, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLEXPORT, INC., | Case No: |
| Plaintiff, | **COMPLAINT FOR TRADE SECRET MISAPPROPRIATION, COPYRIGHT INFRINGEMENT, AND BREACH OF CONTRACT** |
| v. | |
| FREIGHTMATE AI, INC., YINGWEI (JASON) ZHAO, and BRYAN LACAILLADE, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Flexport, Inc. alleges against Defendants Freightmate AI, Inc., Yingwei Zhao, and Bryan Lacaillade as follows:

### NATURE OF THE CASE

1.      Flexport was founded in San Francisco over a decade ago to revolutionize global logistics with 21st-century technologies.  Flexport develops and sells products to optimize the worldwide transportation of goods cheaply and efficiently.  It provides customers with tools and services that simplify the thicket of complex regulatory paperwork, while offering unprecedented levels of granular control over and visibility into the status and location of their shipments. Flexport's customers value the ease of shipping Flexport's innovative products provide, with a vast majority of them praising that the Flexport Platform allows for more precise and faster communication and collaboration with suppliers, partners, and their teams.  The "Flexport Platform" includes the Flexport Client App and internal systems called "Core" and Flexport Forwarding App (FFA).  Automation has been a focus for Flexport since its inception, and its FFA implements the latest advances in artificial intelligence.

2.      Defendant Freightmate is a product of theft, not ingenuity.  Founded by two former Flexport employees, Defendant Zhao and Defendant Lacaillade, Freightmate was built on information and documents brazenly stolen from Flexport.  Months before leaving, Zhao and Lacaillade secretly conspired to form a competing company in stealth mode: Lacaillade left Flexport first to commence the company's operations, while Zhao remained behind as a secret agent, to exfiltrate tens of thousands of sensitive commercial documents containing Flexport's trade secrets.  Zhao downloaded hundreds, sometimes thousands, of files per day onto personal USB drives or cloud storage, employing techniques to hide his tracks.  Days before leaving, but after establishing Freightmate as a co-founder and principal with Lacaillade, Zhao downloaded and exfiltrated Flexport's internally developed and copyrighted Flexport Platform source code. Within weeks, Freightmate launched a competing product.  Freightmate then boasted about "partnering with over three times the number of freight forwarders that [it] anticipated by this time," a feat virtually impossible to achieve so quickly without Flexport's stolen information.

3.      When Flexport confronted Defendants, they eventually admitted to taking

volumes of Flexport's confidential documents without permission. They confessed to using Flexport documents to understand how generative AI digitizes shipping documents. They admitted to retaining a complete backup of Zhao's Flexport laptop, downloading Flexport data onto personal USB storage, and transferring files to a personal cloud. But Defendants were not fully forthright with Flexport. They refused to allow any review of Freightmate source code to determine the extent to which it is derived from Flexport's proprietary information, claiming falsely that Flexport's confidential files "were inadvertently retained and not accessed or used by Freightmate."

4.    Flexport welcomes fair competition, even from former employees. But the actions of Freightmate and its founders were anything but fair—they were unlawful. To this day, Defendants continue to possess Flexport's immensely valuable intellectual property, obtained in violation of federal and state law, as well as contractual duties toward Flexport. Flexport brings this lawsuit to vindicate its rights, recover its stolen property, and enjoin Defendants from disclosing or using Flexport's proprietary information.

## THE PARTIES

5.    Plaintiff Flexport is a corporation incorporated in Delaware and headquartered in San Francisco. Flexport's principal place of business is 760 Market Street, 8th Floor, San Francisco, California 94102.

6.    Defendant Freightmate is a corporation incorporated in Delaware. Plaintiff believes and therefore alleges that Freightmate's principal place of business is 3120 139th Ave SE Office 5-113, Bellevue, Washington 98005.

7.    Defendant Yingwei (Jason) Zhao is an adult individual. Plaintiff believes and therefore alleges that Zhao co-founded Freightmate and serves as its Chief Operating Officer. Plaintiff believes and therefore alleges that Zhao resides in Seattle, Washington.

8.    Defendant Bryan Lacaillade is an adult individual. Plaintiff believes and therefore alleges that Lacaillade co-founded Freightmate and serves as its Chief Executive Officer. Plaintiff believes and therefore alleges Lacaillade resides in Seattle, Washington.

## JURISDICTION AND VENUE

9. Flexport brings this action pursuant to 18 U.S.C. §§ 1836, *et seq*. (the Defend Trade Secrets Act), and 17 U.S.C. §§ 101, *et seq*. (the United States Copyright Act). The Court has subject matter jurisdiction over Flexport's claims pursuant to 28 U.S.C. § 1331 (federal question), 18 U.S.C. § 1836(b)(1) (original jurisdiction for DTSA claims), and 28 U.S.C. § 1338(a) (original jurisdiction for copyright claims).

10. The Court has supplemental jurisdiction over asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

11. The Court has personal jurisdiction over Defendants Zhao and Lacaillade because they consented that San Francisco County courts have exclusive jurisdiction over all disputes between the parties relating to Flexport's intellectual property.

12. This Court additionally has personal jurisdiction over Defendants based on their purposeful availment and connections to California and this District, including those that relate directly to and form the basis of the claims described in this Complaint. Plaintiff believes and therefore alleges that Defendants conspired to obtain and exploit Flexport's proprietary information knowing that the information is secured and managed from Flexport's San Francisco headquarters. Plaintiff believes and therefore alleges that Defendants committed their misappropriation using servers and services of third parties based in this District. Plaintiff believes and therefore alleges that Freightmate directly or through intermediaries, makes, distributes, offers for sale or license, sells or licenses, or advertises its products and services in the State of California and the Northern District of California. For example, Defendants advertise Freightmate's products and services online at www.freightmate.ai, which is accessible in this District. Plaintiff believes and therefore alleges that Defendants wrongfully used and continues to so use Flexport's intellectual property to offer to sell and sell products and services to Flexport's actual or potential customers and partners in California and this District. Plaintiff believes and therefore alleges that Defendants acted with knowledge that the harm from their actions targeting Flexport would be suffered in this District, where Flexport is headquartered.

13.     Based on Defendants' conduct, it was wholly foreseeable that they would be bound and subject to a suit in the Northern District of California.

14.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), because this is a judicial district in which Defendant is subject to the Court's personal jurisdiction with respect to this action.

## DIVISIONAL ASSIGNMENT

15.     This is an action for trade secret misappropriation and related claims, where a substantial part of the events or omissions that give rise to the claims occurred in San Francisco County.     Further, Defendants' conduct breached contractual obligations that contemplated resolution of disputes in San Francisco County.     Thus, pursuant to Civil L.R. 3-2, this action should be assigned to the San Francisco Division.

## FACTUAL ALLEGATIONS

**A.      Flexport is a San Francisco technology company whose innovations continue to disrupt the global logistics industry.**

16.     Flexport was founded in 2013 in San Francisco to remove roadblocks that challenge companies engaged in global trade.     From its earliest days, Flexport's approach has involved combining automation with human expertise.     More than 10,000 customers trust Flexport with their respective supply chains, from emerging brands to Fortune 500s, shipping nearly $19 billion of merchandise across 112 countries with Flexport technology in 2021.

17.     Flexport has been described as "a tech-enabled freight forwarder."     A freight forwarder tackles the complexity required to move freight across a network of logistics asset owners.     Moving goods from Point A to Point B, particularly across international boundaries, often involves over a dozen actors.     For instance, there is usually a factory, an importer, a warehouse, a trucking company in the exporting country and another in the importing country, ports, custom brokerages, ocean carriers, insurance companies, equipment providers, and lenders. It is economically unviable for one firm to own all these assets, and so, on any given shipment, freight forwarders assemble and help engage the multiple asset owners needed.     Flexport's

innovative products and services simplify customers' management of these processes so that the customers can operate more efficiently and profitably.

**B.    Flexport's intellectual property is critical to its success.**

18.    Flexport's technological innovations and improvements drive Flexport's success. Flexport invests heavily in its engineering and business teams' creation of industry-leading technologies and related products and services. Since 2013, Flexport has invested over hundreds of millions in research and development, including to generate the intellectual property at issue. Automation and artificial intelligence are central to Flexport's products, and Flexport has invested heavily to develop AI products, including those at issue.

19.    Flexport's "Core" and the Flexport Forwarding App (FFA) are two freight management systems that Flexport developed to manage operations, automate workflows, and optimize costs. The systems work together with the Flexport Client App, which allows Flexport customers secure access to information specific to them and their shipments. These tools, along with additional apps for Flexport's importers and exporters, constitute the Flexport Platform. The Flexport Platform allows users to obtain quotes, request and book shipments, track global freight movements in real-time, manage product data, visualize supply chains, view analytics, and so on. The Flexport Platform includes features for ingestion of data, analyzing the information, digitization of the information, and automation.

20.    Flexport developed and deployed FFA as a successor to Core. FFA implements a "Zero Touch" framework, where the user defines the eligibility for work items to be automated, and then Flexport's proprietary technology provides a tailored experience that allows the user to direct their focus only on aspects of their shipment that they opted not to automate. Development of FFA, including the proprietary technology that drives its Zero Touch capabilities, began in 2021, and since that time, Flexport has invested many millions toward its development.

21.    Details regarding the inner workings of the Flexport Platform constitute Flexport trade secrets. In particular, the source code, architecture, algorithms, methods, design, distribution, capabilities, and operation of this platform are all nonpublic (including the data used to feed and teach the software), and are maintained in strict confidence. This information derives

1  considerable value from not being known outside of Flexport and offers Flexport a significant

2  competitive advantage over its competitors.

3      22.    This case concerns Copyrighted Flexport Platform Source Code, Flexport

4  Platform Trade Secrets, and Flexport Business and Operational Trade Secrets.

5      23.    <u>Copyrighted Flexport Platform Source Code</u>.  Flexport's source code relating to

6  internal and external Flexport products is proprietary to Flexport, not public, and contains

7  Flexport's trade secrets.  This information is not discernable from public sources.  For example,

8  public sources do not disclose the details regarding how the Flexport Platform helps document,

9  track, and connect the global trade ecosystem on a single platform—including buyers, sellers and

10  logistics companies.  This information took years of development work and allows Flexport to

11  offer its customers an unprecedented level of visibility into and control over granular and accurate

12  real-time details about shipments.

13      24.    Flexport also owns the copyrights in its source code.  For example, a version of

14  the Flexport Platform source code is registered with the United States Copyright Office as U.S.

15  Copyright No. TXu 2-473-064, with an effective date of registration of March 6, 2025.

16      25.    <u>Flexport Platform Trade Secrets</u>.  Flexport's proprietary algorithms, methods,

17  operation, capabilities for ordering, organizing, and tracking shipments, and Flexport's

18  proprietary pricing information relating to the Flexport Platform constitute Flexport's trade

19  secrets.  This information is not discernable from public sources.  For example, public sources do

20  not disclose Flexport's specialized process to digitize and structure customer supply chain data

21  for use with the Flexport Platform.  Likewise, public sources do not disclose Flexport's

22  proprietary datasets and algorithms that allow Flexport to make and provide data-driven shipping

23  services, shipping operations, and logistics planning services for manufacturers and retailers

24  worldwide.  This information took years of development work and allows Flexport's customers

25  to save considerable time and money in the shipping of products worldwide.

26      26.    <u>Flexport Business and Operational Trade Secrets</u>.  Flexport's playbooks for

27  technology integrations, its internal library of standard operating procedures, documentation

28  regarding training offerings that Flexport provides as services, internal training materials,

competitive research documents, and marketing strategies constitute Flexport's trade secrets. This information is not discernable from public sources.  For example, public sources do not disclose the expert consultation and advice that the Flexport team provides customers in areas such as integration of their systems, customized configurations, screening and working with specific partners, vendors, supply chains, and adapting to various industry invoicing methodologies.  Similarly, public sources do not disclose Flexport's library of standard operating procedures documentation that standardizes Flexport's hard-won experience in all these areas and that Flexport employees leverage in serving the company's customers.  Likewise, public sources disclose neither the factors nor the intelligence Flexport considers for making informed decisions regarding the development of new products or services, operations across geographies and sectors, and other critical aspects of Flexport's business.  These aspects include considerations for whether and how Flexport should operate or partner with persons in a territory, as well as best practices and guidelines to help the company build and retain goodwill, and to communicate honestly and precisely about its offerings to actual or potential customers.  This deep well of information is the result of years of research and of Flexport documenting and refining its practices.  It allows Flexport to continue improving its products and services, and growing its business.

27.     The Copyrighted Flexport Platform Source Code, Flexport Platform Trade Secrets, and Flexport Business and Operational Trade Secrets are not publicly known nor readily discoverable outside of Flexport.

**C.     Flexport takes extensive and diligent measures to protect its proprietary information.**

28.     Flexport vigorously guards its commercially sensitive and proprietary information, including the trade secrets at issue.

29.     For example, Flexport requires promises of non-disclosure and non-misuse before disclosing any confidential information.  Flexport requires its employees to sign and be trained in an Employee Inventions & Proprietary Information Agreement ("Agreement"), an Acceptable Use Policy ("Policy"), a Flexport Employee Handbook ("Handbook"), and a C-TPAT Code of

Conduct ("Code"). The Agreement requires employees to "hold in strict confidence and not directly or indirectly disclose or use any Proprietary Information, except as required within the scope of [their] employment," and upon termination of employment, to "promptly identify and, as directed by the Company, destroy, delete or return to the Company all items containing or embodying Proprietary Information (including all original or copies of content, whether in electronic or hard-copy form)." The Policy states that employees "must preserve the confidentiality" of company data, and that employees "may access, use or share Flexport proprietary information only to the extent it is authorized and necessary to fulfill [their] assigned job duties." The Handbook provides guidance for employees to ensure that Flexport's trade secrets remain protected. Under the section "Basic Rules of Conduct," the Handbook prohibits "[u]nauthorized disclosure of business 'secrets' or confidential information." The Code confirms that "[a]ll customer and company information and computer data belongs to the company and shall not be copied, transmitted or shared with anyone outside of Flexport or their active business partners."

30. All Flexport employees are provided copies of the above obligations. Every employee is required to participate in security training when joining the company and to receive ongoing training throughout their Flexport careers. Topics covered include device security, acceptable use, preventing spyware/malware, identifying and reporting phishing emails, physical security, data privacy, account management and incident reporting, among others. Similarly, in dealing with customers and third-parties, Flexport requires execution of non-disclosure or confidentiality agreements before granting access to confidential information.

31. Flexport also relies on technological security measures. For example, Flexport issues company devices to its employees, which include end-point security software to secure the Flexport ecosystem. Further, access to Flexport proprietary information is controlled. Flexport allows access only on a "need-to-know" basis, while adopting the "least privileged" approach, which means that access is denied by default, absent a showing of need. Similarly, the Flexport Platform was designed to include stringent access control measures that allow Flexport to define who, within or outside the company, may access any document or category of document. Flexport

uses these access control tools diligently and trains its employees on them. Across its systems, Flexport deploys industry-standard tools for multi-factor authentication, and Flexport employees must utilize strong passwords that comply with predefined parameters. Furthermore, Flexport implements multiple Intrusion Detection/Prevention Systems (IDS), including host-based firewalls, network-based IDS, host-based IDS, and file integrity monitoring. With some narrow exceptions, only Flexport-issued devices are permitted to access Flexport's confidential and trade secret information, and use of removable or external storage devices (*e.g.*, USB flash drives, and personal cloud storage) is prohibited. Flexport obtained SOC 2 certification after an audit by an independent third-party auditor who validated Flexport's systems, applications, people, and processes.

32.    Flexport has an Information Security team based in San Francisco. This team is tasked with preventing, detecting, and investigating any unauthorized access, duplication, or disclosure of Flexport's confidential information. The team implements industry-leading tools to perform these tasks.

**D.    Flexport entrusted Lacaillade and Zhao with Flexport's trade secrets.**

33.    Defendants Zhao and Lacaillade are both former employees of Flexport. Zhao joined Flexport on June 1, 2021, as Principal Technical Program Manager. He remained in this role until his departure from Flexport on June 4, 2024. Lacaillade joined Flexport on October 18, 2021, as Group Product Manager. He was promoted to Director, Product Manager, with effect from April 1, 2024, and remained in this role until his departure from Flexport on May 10, 2024.

34.    Both Zhao and Lacaillade were original members of the team tasked with developing FFA and its automation tools. Both promised to protect, and not misuse, Flexport's trade secrets. Each of these former Flexport employees agreed to Flexport's Agreement, Policy, Handbook, and Code described above. Each employee also accepted a "responsibility to promptly report the theft, loss or unauthorized disclosure of Flexport proprietary information."

35.    However, as detailed below, Zhao and Lacaillade conspired and acted to breach their contractual obligations to Flexport for their own benefit and that of their company, Freightmate.

1    **E.    Defendants misappropriated Flexport's trade secrets, infringed Flexport's**

2    **copyrights, and misused Flexport proprietary information.**

3        36.    Plaintiff believes and therefore alleges that, no later than January 2024, Zhao and

4    Lacaillade agreed to create Defendant Freightmate while working for Flexport.  For example,

5    Plaintiff believes and therefore alleges that, on or about January 28, 2024, the domain name

6    "freightmate.ai" was registered for Defendants to promote Freightmate's business and products.

7        37.    Although Zhao and Lacaillade's actions created a conflict of interest with their

8    employment at Flexport—and both employees were contractually obligated to disclose this

9    conflict to Flexport—neither did.

10       38.    Plaintiff believes and therefore alleges that, in January 2024, Zhao began secretly

11   stealing Flexport's trade secrets for use by Freightmate.  Plaintiff believes and therefore alleges

12   that Zhao saved to his personal storage without authorization over 70,000 confidential Flexport

13   documents.

14       39.    For example, Plaintiff believes and therefore alleges that, on or about January 31,

15   2024, Zhao created a secret file in his Flexport work account on Google Sheets called "FFA Plan,"

16   and copy-pasted Flexport data into that personal file.  Plaintiff believes and therefore alleges that

17   Zhao later used his personal device to log into the account and download the information onto his

18   device for Defendants' benefit.

19       40.    Plaintiff believes and therefore alleges that, on multiple subsequent occasions

20   between February 1 and May 13, 2024 (when Lacaillade and Zhao co-founded Defendant

21   Freightmate), Zhao used this approach to first gather or stage materials to copy on his Flexport

22   work account with Google, and then copied the materials into storage mediums he controlled.

23   Plaintiff believes and therefore alleges that Zhao stole volumes of highly confidential Flexport

24   information and trade secrets in this manner.

25       41.    For example, Plaintiff believes and therefore alleges that, on or about February 22,

26   2024, Zhao copied Flexport trade secrets into a Google Slides document called "FFA Automation

27   Update."  Then, days prior to his departure, on or around May 31, 2024, Plaintiff believes and

28

therefore alleges that Zhao copied this file from his Flexport work account on Google Slides onto a personal device.

42.    Likewise, Plaintiff believes and therefore alleges that, on or about April 2, 2024, Zhao copied trade secret information into a Google Sheets document named "freight_forwarding producer_work_item_types_mapping."  Then, on May 23, 2024, Plaintiff believes and therefore alleges that Zhao copied this file from his Flexport work account on Google Sheets onto a personal device.

43.    Similarly, Plaintiff believes and therefore alleges that, on or about May 3, 2024, Zhao copied trade secrets into a personal Google Docs file named "[New Version] Send Flexport Arrival Notice WI Automation Requirements."  Later, on May 13, 2024, Plaintiff believes and therefore alleges that Zhao copied this file from his Flexport work account on Google Docs onto a personal device.

44.    Plaintiff believes and therefore alleges that Defendants knew that Zhao's exfiltration of Flexport trade secrets was wrong and even took steps to conceal it.  For example, Plaintiff believes and therefore alleges that, on or about March 15, 2024, Zhao used his browser's "INCOGNITO" mode to copy-paste information relating to FFA, from a file titled "ffapp_model applicable_work_items 2024-03-11T1152.csv."  This is a proprietary Flexport customer list that contains a list of over 1,000 Flexport customers that Flexport's nonpublic and proprietary database identified as "Active" clients.

45.    Plaintiff believes and therefore alleges that Zhao and Lacaillade, as co-founders and principals of Defendant Freightmate, were acting in concert in furtherance of their intentions to compete unfairly with Flexport using stolen Flexport intellectual property.

46.    On May 10, 2024, Lacaillade left Flexport.  Plaintiff believes and therefore alleges that, the very next business day, on May 13, 2024, Lacaillade and Zhao incorporated Freightmate in Delaware.  Neither Lacaillade nor Zhao reported this to Flexport.

47.    Instead, Zhao remained at Flexport for another month to exfiltrate Flexport's intellectual property.  Indeed, Flexport's investigations to date show that, between May 13, 2024, and his departure from Flexport on June 4, 2024, Zhao copied without authorization at least

60,000 files from Flexport's secure repositories.  As illustrated below, these files contained Flexport's trade secrets, copyrighted source code, and confidential information.

**F.    Defendants admit to stealing, disclosing, and using Flexport's trade secrets.**

48.    Plaintiff believes and therefore alleges that Freightmate competes with Flexport. For example, Plaintiff believes and therefore alleges that, in June 2024, Defendants exited "stealth mode" and announced the release of Freightmate's "first automated solution."[1]  Mirroring Flexport's core business proposition, Defendants' investor stated that Defendants would develop "a next-gen-AI-powered freight management system" because "[f]reight forwarders coordinate global shipments from end to end from origin country to destination country, leveraging decades-old software with zero task automation, no real-time communication, with a very limited UX."

49.    In or about September 2024, after learning of Freightmate and its objective of developing AI-powered freight management systems, Flexport was shocked to discover that Defendant Zhao had taken thousands of Flexport documents in the weeks and months leading up to his departure.

50.    Promptly thereafter, on September 6, 2024, Flexport sent a legal notice to Zhao and Lacaillade outlining Flexport's concerns and seeking their cooperation in assessing the scope of their data theft and in recovering Flexport's data.

51.    In a response dated November 1, 2024, Defendants did not dispute that Zhao downloaded Flexport documents prior to his departure from Flexport.  However, Defendants contested that any Flexport source code was exfiltrated and refused to allow any review of Freightmate's source code.

52.    In a letter dated December 19, 2024, Defendants provided a further response to Flexport's legal notice.  This response admitted that Lacaillade and Zhao together incorporated Freightmate on May 13, 2024.  The response admitted that Defendants did not start even building a prototype of Freightmate's product until June 7, 2024, *i.e.*, *after* Zhao had already exfiltrated

---

[1] *See* Sharkey, G., "Freightmate Ai exits stealth mode with pre-seed funding and new tech" (Jun. 27, 2024), Freight Waves, available online at https://www.freightwaves.com/news/freightmate-ai-exits-stealth-mode-with-pre-seed-funding-and-new-tech (last visited on March 11, 2025).

Flexport's trade secrets, copyrighted source code, and proprietary information.  As noted above, Defendants launched Freightmate's initial product three weeks later, on or about June 27, 2024, an incredible feat that Flexport believes and therefore alleges would not have been possible without the benefit and use of Flexport intellectual property.  Defendants further admitted that, before developing Freightmate's products, they secretly ran confidential Flexport documents "through ChatGPT to better understand how generative AI digitizes analog shipping documents."  Defendants had no authorization to use Flexport's proprietary information for their own benefit or to disclose it to third parties in this manner.

53.     In its December 19, 2024, letter, Defendants further admitted that their forensic expert found over 9,000 Flexport documents in Defendants' possession.  They admitted that Zhao took without permission at least the following confidential Flexport files: "Final Flexport RFP H2.xlsx," "Rates for Flexport.xlsx," "FFA Automation Demo.mp4," and "ffapp_model applicable_work_items 2024-03-11T1152.csv."  Defendants also admitted that Zhao retained "a complete backup" of his Flexport laptop, but claimed that Zhao retained Flexport's intellectual property "passively and inadvertently."  Plaintiff believes and therefore alleges that this claim is false, and Zhao intentionally and knowingly took this information without permission for Defendants' benefit and use, while taking steps to conceal his exfiltration of Flexport trade secrets.

54.     Between January and February 2024, Flexport investigated Defendants' conduct and response.  Flexport determined that, just days before his departure, on May 30, 2024, Zhao downloaded the Copyrighted Flexport Platform Source Code ("flexport-master.zip") onto his USB drive.  Flexport believes and therefore alleges that Zhao obtained this massive file of critical Flexport source code using his Flexport work account on GitHub, which is the primary tool Flexport software programmers use to collaborate and write source code.  Flexport believes and therefore alleges that the ZIP file contained a "master" repository of Flexport's GitHub workspaces, *i.e.*, source code, as of early 2024.  Flexport believes and therefore alleges that this source code related to all then-existing features of the Flexport Platform.

55. Flexport also determined that, besides the Copyrighted Flexport Platform Source Code, Defendants had also misappropriated Flexport Platform Trade Secrets, and Flexport Business and Operational Trade Secrets.

56. For example, Flexport believes and therefore alleges that Zhao took in furtherance of Defendants' conspiracy and for Defendants' benefit Flexport Platform Trade Secrets contained in multiple files, including those titled "Work Item Automation Deep Dive," "Import FFA Partner WIs," "FFApp Instrumentation Validation MVP," "FF App Roadmap," and "CU-ISF V2 Core Integration Runbook-130524-185733.pdf." Flexport believes and therefore alleges that Defendants conspired to take and took these materials to help develop a freight management system that competes with the Flexport Platform. For example, in January 2025, Defendants announced close of a seed funding round, reiterating that, "[w]hile freightmate currently focuses on automating specific workflows," its goal is to build an "automated Freight Management System (FMS), powered by AI" to "unlock zero-touch shipments."

57. For example, Flexport believes and therefore alleges that Zhao took in furtherance of Defendants' conspiracy and for Defendants' benefit Flexport Business and Operational Trade Secrets contained in multiple files, including those titled "[New Version] Send Flexport Arrival Notice WI Automation Requirements.pdf," "air-freight-scrapers-130524-185844.pdf," "BOL Training.pptx," "China Legal Framework and Practice for Export of Medical Devices.pdf," "Dangerous Goods Training Manual (CBTA)," "Flexport competition law compliance training.pdf," "Flexport Dangerous Goods SOP," "Shipment Operations MBR Metrics," "New Brand Deck Assets," "Flexport_Brand_Guidelines_February_2024.pdf," and "Quality, On-Brand Messaging." Flexport believes and therefore alleges that Defendants conspired to take and took these materials to avoid the costs involved in researching and developing expertise and experience in navigating the complex global logistics ecosystem, to freeride off Flexport's years of developing and refining strategies for expanding and promoting its business, and to train its current and anticipated AI-related product and service offerings, including its document ingestion tool called "Docmate."

58.     Flexport believes and therefore alleges that Defendants have used, and continue to use, Flexport's trade secrets, copyrighted source code, and confidential information, as is apparent from Freightmate's ability to rapidly serve Flexport's competitors and customers.  For example, in or about January 2025, Freightmate noted that it is "partnering with over three times the number of freight forwarders that [it] anticipated by this time."  Flexport believes and therefore alleges that this would not have been possible without Defendants' improper access, copying, disclosure, and use of Flexport's intellectual property.

59.     Flexport has suffered, and continues to suffer, damages because of Defendants' conduct.  For example, Flexport believes and therefore alleges that Defendants are already selling, and intending to sell, Freightmate's derivative products and services to Flexport's actual and potential customers, to compete unfairly with Flexport.

60.     Flexport is being irreparably harmed due to Defendants' continuing wrongdoing.  For example, Flexport believes and therefore alleges that its trade secrets remain in the hands of Defendants, who should never have possessed those trade secrets in the first place, and Zhao, who has already engaged in egregious and dishonest conduct involving these valuable assets of Flexport.  Flexport believes and therefore alleges that Defendants continue to exploit Flexport's intellectual property, while Flexport is deprived its right to exclusive enjoyment of its property.  Furthermore, Flexport believes and therefore alleges that Flexport's confidential information remains subject to potential exposure or misuse by persons whom Flexport cannot control.  This places Flexport in an untenable position through no fault of Flexport.

61.     Therefore, Flexport seeks legal and equitable relief, including damages and restitution, as well as a preliminary and a permanent injunction.

## COUNT I

### TRADE SECRET MISAPPROPRIATION
### The Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b), 1839 et seq.,
### The California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq.
### (Against All Defendants)

62.    Flexport re-alleges and incorporates by reference the allegations above as though fully set forth herein.

63.    Flexport owns trade secrets.  In particular, as detailed above, Flexport is the owner of the Copyrighted Flexport Platform Source Code, Flexport Platform Trade Secrets, and Flexport Business and Operational Trade Secrets.  Flexport has invested significant time and money developing this intellectual property, which is of substantial economic value due to its nonpublic nature and provides Flexport a competitive advantage.  At all times relevant, Flexport took reasonable measures, as detailed above, to protect the secrecy of the trade secrets at issue.

64.    Flexport's trade secrets relate to products or services used in and intended for use in interstate commerce.  For example, the Flexport Platform is used, sold, purchased, or transported, or intended for use, sale, purchase, or transport, across the United States and throughout the world, including this District.  Flexport uses the trade secrets Defendants misappropriated to cater to its customers worldwide, who engage in international trade and/or interstate trade within the United States.  Furthermore, the trade secrets were stolen across state lines, from San Francisco-headquartered Flexport by Washington-based Defendants.

65.    Flexport believes and therefore alleges that Defendants misappropriated Flexport's trade secrets.  Flexport afforded Zhao and Lacaillade access to Flexport's trade secret information only on the condition that they recognize and protect the information as Flexport's trade secrets.  Flexport believes and therefore alleges that Defendants acted in concert to, without permission and in contravention of Zhao's and Lacaillade's contractual obligations toward Flexport, acquire, access, disclose, and use Flexport's trade secrets for their own benefit.  Flexport believes and therefore alleges that Defendants misappropriated Flexport's trade secret by possessing and using the trade secrets knowing them to be stolen, and refusing to return them to Flexport.  Flexport believes and therefore alleges that, since acquiring Flexport's trade secrets,

Defendants have used and disclosed those trade secrets, including to influence the development and release of products that compete with Flexport's offerings.

66. Flexport believes and therefore alleges that Defendants knew or had reason to know at the time they acquired, accessed, disclosed and used Flexport trade secrets that this information is confidential and was acquired and maintained by improper means and under circumstances giving rise to a duty to maintain secrecy or limit use, including by virtue of the Agreement, Policy, Handbook, and Code. Flexport believes and therefore alleges that Defendants further knew or had reason to know that this information was developed or acquired by Flexport at great expense and effort. Flexport believes and therefore alleges that Defendants further knew or had reason to know that Flexport maintains this information as confidential, that the information is not generally available to the public or to Flexport's competitors, and that the information would provide significant benefit to anyone seeking to compete with Flexport.

67. Flexport believes and therefore alleges that Flexport and Freightmate are competitors in the logistics and freight management industries. Flexport believes and therefore alleges that Defendants have developed and are developing for sale products and services that compete with Flexport's offerings like the Flexport Platform and the suite of features the platform offers Flexport customers. Flexport believes and therefore alleges that Defendants' products and services, derived wrongfully from Flexport's trade secrets, undermine the competitive advantage that the Flexport Platform offers Flexport.

68. Flexport believes and therefore alleges that Defendants acted in concert and as joint tortfeasors to wrongfully access, copy, disclose, and use Flexport's trade secrets. Furthermore, Flexport believes and therefore alleges that Zhao is an agent of Freightmate and acted within the scope of his employment with Freightmate in dishonestly acquiring, disclosing, and using Flexport's trade secret information to benefit Freightmate. Freightmate is therefore vicariously liable for Zhao's misappropriation of Flexport's trade secrets, in addition to being directly liable for its own improper acquisition, use, and disclosure of Flexport's trade secrets as alleged herein.

69.     At no time did Flexport consent to Defendants' improper acquisition, disclosure, or use of Flexport's trade secrets.

70.     Thus, Defendants have engaged in the actual and threatened misappropriation of Flexport's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b), 1839 et seq., and the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq.

71.     Flexport believes and therefore alleges that Defendants continue to possess and use Flexport's trade secrets to compete with Flexport.

72.     Defendants' misappropriation has directly and proximately caused damage to Flexport, including but not limited to loss of profits, loss of goodwill, damage to its reputation, and damage to its competitive advantage and business opportunities—for which Flexport is seeking compensation.

73.     Defendants have been unjustly enriched as a further proximate result of their misappropriation of Flexport's trade secrets—for which Flexport also is seeking compensation.

74.     Flexport is entitled to compensatory damages and disgorgement of any and all profits Defendants made as a result of their wrongful conduct, in amounts to be proven at trial.

75.     Flexport believes and therefore alleges that Defendants' actions in misappropriating Flexport's trade secret were willful, fraudulent, malicious, and were done with the intent to injure and oppress Flexport and improve Defendants' own economic opportunities, thereby justifying an award of punitive damages against Defendant pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

76.     Defendants' actions have caused and will continue to cause Flexport irreparable harm if not preliminarily and permanently enjoined.  Flexport has no adequate remedy at law. Flexport is thus entitled to injunctive relief to protect its confidential information and trade secrets by 1) enjoining Defendants from further possessing, using or disclosing Flexport's trade secret; 2) enjoining Defendants from altering or deleting Flexport's trade secrets before returning them; and 3) requiring Defendants to turn over to Flexport any and all copies of Flexport's trade secret, including any products or information derived therefrom.

## COUNT II

### COPYRIGHT INFRINGEMENT
### (Against All Defendants)

77.    Flexport incorporates and re-alleges every allegation above as if fully set forth herein.

78.    The Copyrighted Flexport Platform Source Code is an original work that constitutes copyrightable subject matter under 17 U.S.C. §§ 101 *et seq.*  Flexport owns all rights and privileges in such work and has registered the copyrights in it with the United States Registrar of Copyrights.

79.    Defendants had access to the Copyrighted Flexport Platform Source Code, including by virtue of Zhao's and Lacaillade's employment at Flexport.

80.    Defendants copied the Copyrighted Flexport Platform Source Code.  For example, Flexport believes and therefore alleges that, in furtherance of Defendants' conspiracy and for Defendants' benefit, Zhao reproduced without authorization the Copyrighted Flexport Platform Source Code into a ZIP file and then reproduced without authorization the code as contained in the ZIP file onto his personal storage.  Flexport believes and therefore alleges that Zhao created these unauthorized copies in concert with Defendants, as Freightmate's agent, and for his own benefit and that of his co-Defendants.

81.    Flexport believes and therefore alleges that Defendants knew that copyrights in the Copyrighted Flexport Platform Source Code belonged to Flexport and that Defendants did not have permission to copy it.  Flexport believes and therefore alleges that Defendants' infringement has been deliberate and with willful disregard of Plaintiff's rights.

82.    Flexport believes and therefore alleges that Defendants have realized unjust profits, gains, and advantages as a proximate result of its infringement, and will continue to so benefit until required to return the infringing copies.

83.    As a direct and proximate result of Defendants' infringement, Flexport has suffered, and will continue to suffer, actual damages.  Flexport is entitled to its actual damages

and any gains, profits, and advantages Defendants obtained through infringement, as well as attorneys' fees.

84.     Flexport has no adequate remedy at law for its current and prospective injuries. Defendants' continued wrongful conduct has caused and will continue to cause Flexport irreparable injury that cannot be adequately remedied at law unless the Court enjoins Defendants from further infringement.

### COUNT III

### BREACH OF CONTRACT
### (Against Defendants Zhao and Lacaillade)

85.     Flexport incorporates and re-alleges every allegation above as if fully set forth herein.

86.     Flexport had a valid contract with each of Zhao and Lacaillade.  For example, Zhao and Lacaillade voluntarily accepted each of the Agreement, Policy, Handbook, and Code. Flexport fulfilled its obligations toward each employee under the parties' contracts.

87.     Flexport believes and therefore alleges that Zhao and Lacaillade materially breached and continue to be in breach of their respective obligations toward Flexport.  For example, Zhao and Lacaillade each breached their representation to Flexport that they have "not made, and agree not to make, any agreement, oral or written, that is in conflict with [the] Agreement or [their] employment with the Company."  By concealing their intention to form, and their actions toward forming, a business to compete with Flexport, Zhao and Lacaillade wrongfully deprived Flexport any opportunity to revoke or limit Zhao's and Lacaillade's access to Flexport intellectual property.  Flexport believes and therefore alleges that Zhao and Lacaillade intentionally breached their contractual and fiduciary obligations in furtherance of their conspiracy to exfiltrate Flexport trade secrets for the benefit of Defendants.

88.     Furthermore, Flexport believes and therefore alleges that, acting in concert, Zhao and Lacaillade breached their obligations under the Agreement to "hold in strict confidence and not directly or indirectly disclose or use any Proprietary Information, except as required within the scope of [their] employment."  They similarly breached their assignment to Flexport of "all

right, title and interest in and to all Inventions (including all Intellectual Property Rights therein, related thereto or embodied therein) that are collected, made, conceived, developed, reduced to practice or set out in any tangible medium of expression or otherwise created, in whole or in part" using Flexport proprietary information. They further breached their promise to, "[u]pon termination of [their] employment," "promptly identify and, as directed by [Flexport], destroy, delete or return to [Flexport] all items containing or embodying [its] Proprietary Information (including all original or copies of content, whether in electronic or hard-copy form)[.]"

89.    Furthermore, Zhao and Lacaillade breached (and continue to be in breach of) their duty under the Policy to use "information systems . . . only . . . for business objectives that serve the interests of Flexport and their customers." They further breached their agreement to treat as "the sole property of Flexport," "Flexport proprietary information stored on electronic and computing devices whether owned or leased by Flexport, [Zhao or Lacaillade] or a third party."

90.    In similar respects, Zhao and Lacaillade also breached their obligations toward Flexport under the Handbook and the Code.

91.    Likewise, Zhao and Lacaillade breached, and continue to breach, their obligation under the Policy to "report the theft, loss or unauthorized disclosure of Flexport proprietary information." For example, by falsely asserting that Defendants "inadvertently" retained Flexport's proprietary information, Defendants disregard this obligation of Zhao and Lacaillade to assist Flexport in assessing the extent of Defendants' misuse of the information.

92.    As a proximate result of Zhao's and Lacaillade's actions, Flexport has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law. For example, Flexport has been deprived the exclusive enjoyment of its valuable intellectual property, while Defendants exploit Flexport proprietary information to unfairly compete with Flexport.

93.    Flexport believes and therefore alleges that Zhao and Lacaillade have no justification for these actions.

94.    Flexport is entitled to damages, permanent injunctive relief against further breaches of the contractual obligations identified above, including the return to Flexport of all Flexport proprietary information as well as any derivative information or products.

**JURY DEMAND**

95.    Pursuant to Civ. L.R. 3-6 and Fed. R. Civ. P. 38, Flexport requests trial by jury for all causes of action, claims, or issues in this action that are so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Flexport prays for as follows:

A.    For judgment in Flexport's favor on all causes of action alleged against Defendants;

B.    Award Flexport damages in an amount to be determined at trial, including without limitation, Flexport's lost revenues and profits, and any unjust enrichment, restitution, disgorgement, contract damages, or reasonable royalty to the extent permitted under the law;

C.    Award preliminary and permanent injunction against Defendants, 1) enjoining Defendants from possessing, using or disclosing Flexport's trade secret; 2) enjoining Defendants from altering or deleting Flexport's trade secrets before returning them; and 3) requiring Defendants to turn over to Flexport any and all copies of Flexport's trade secret, including any products or information derived therefrom.

D.    Award preliminary and permanent injunction against Defendants restraining them, and each of their agents, servants, employees, attorneys, successors and assigns, affiliates and all persons, firms, and corporations acting in concert with them, from directly or indirectly violating Flexport's copyrights;

E.    An injunction requiring Zhao and Lacaillade, and each of their agents, servants, employees, attorneys, successors and assigns, affiliates and all persons, firms, and corporations acting in concert with them, to return to Flexport all Flexport proprietary information in their possession, including any products or information derived therefrom, and to identify Defendants' disclosures or use of such information;

F.    A declaration that Defendants hold in constructive trust for Flexport any intellectual property developed using or derived from Flexport's intellectual property, and an injunction requiring Defendants to assign to Flexport all such intellectual property;

G.    Award Flexport punitive and exemplary damages in an amount to be determined at trial;

H.    Award Flexport pre-judgment and post-judgment interest, attorneys' fees and costs, and other expenses incurred in this action; and

I.    For such other and further relief as the Court may deem to be just and proper.


Respectfully submitted,
TYZ LAW GROUP PC

Dated: March 12, 2025                    /s/Ryan Tyz
                                        Ryan Tyz

                                        TYZ LAW GROUP PC
                                        Attorneys for Plaintiff Flexport, Inc.