**SPENCER FANE LLP**
John V. Picone III (State Bar No. 187226)
jpicone@spencerfane.com
Jeffrey M. Ratinoff (State Bar No. 197241)
jratinoff@spencerfane.com
Jennifer S. Coleman (State Bar No. 213210)
jcoleman@spencerfane.com
Jing H. Cherng (State Bar No. 265017)
gcherng@spencerfane.com
225 West Santa Clara Street, Suite 1500
San Jose, CA 95113
Telephone: (408) 286-5100
Facsimile: (408) 286-5722

Attorneys for Plaintiff
FLEXPORT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FLEXPORT, INC.,

Plaintiff,

v.

FREIGHTMATE AI, INC.; YINGWEI (JASON) ZHAO; and BRYAN LACAILLADE,

Defendants.

Case No.: 3:25-cv-02500-RFL-PHK

**SECOND AMENDED COMPLAINT FOR TRADE SECRET MISAPPROPRIATION, BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTY**

**DEMAND FOR JURY TRIAL**

Action Filed: March 12, 2025

Plaintiff Flexport, Inc. alleges against Defendants freightmate Ai, Inc. ("Freightmate"), Yingwei Zhao, and Bryan Lacaillade as follows:

**NATURE OF THE CASE**

1. Flexport was founded in San Francisco over a decade ago to revolutionize global logistics with 21st-century technologies. Flexport develops and sells products to optimize the worldwide transportation of goods cheaply and efficiently. It provides customers with tools and services that simplify the thicket of complex regulatory paperwork, while offering unprecedented levels of granular control over and visibility into the status and location of their shipments. Flexport's customers value the ease of shipping Flexport's innovative products provide, with a vast majority of them praising that the Flexport Platform allows for more precise and faster communication and collaboration with suppliers, partners, and their teams. The "Flexport Platform" includes the Flexport Client App and internal systems called "Core" and the Flexport Forwarding App (FFA). Automation has been a focus for Flexport since its inception, and its FFA implements the latest advances in artificial intelligence.

2. Defendant Freightmate is a product of theft, not ingenuity. Founded by two former Flexport employees, Defendant Lacaillade and Defendant Zhao, Freightmate was built on information and documents brazenly stolen from Flexport. Months before leaving, Lacaillade and Zhao secretly conspired to form a competing company in stealth mode. They began meeting regularly on Flexport company time to work on their new venture and make unauthorized copies of proprietary files. Lacaillade pumped Flexport experts for technical insights to exploit as Freightmate, while Zhao exfiltrated Flexport's documented trade secrets, including those Lacaillade identified to Zhao and the two discussed in their secret meetings. Lacaillade left Flexport first to commence the company's operations, while Zhao remained behind as the new company's employee and secret agent, to exfiltrate tens of thousands more sensitive commercial documents containing Flexport's trade secrets. Zhao downloaded hundreds, sometimes thousands, of files per day onto personal USB drives or cloud storage, employing techniques to hide his tracks. Days before leaving, but after establishing Freightmate as a co-founder and principal with Lacaillade, Zhao downloaded and exfiltrated Flexport's internally developed and copyrighted Flexport

Platform source code. Within weeks, Freightmate launched a competing product. Freightmate then boasted about "partnering with over three times the number of freight forwarders that [it] anticipated by this time," a feat virtually impossible to achieve so quickly without Flexport's stolen information.

3. When Flexport confronted Defendants, they eventually admitted to taking volumes of Flexport's confidential documents without permission. They confessed to using Flexport documents to understand how generative AI digitizes shipping documents. They admitted to retaining a complete backup of Zhao's Flexport laptop, downloading Flexport data onto personal USB storage, and transferring files to a personal cloud. But Defendants were not fully forthright with Flexport. They refused to allow any review of Freightmate source code to determine the extent to which it is derived from Flexport's proprietary information, claiming falsely that Flexport's confidential files "were inadvertently retained and not accessed or used by Freightmate."

4. Defendants' hedging confessions proved just the tip of the iceberg. Defendants now admit that thousands of Flexport documents, including documents containing valuable trade secrets, were uploaded into the Freightmate Google Drive, then shared among Freightmate employees and used in the development of Freightmate products. Defendants then purged evidence after announcing their product. Defendants understood their possession and use of Flexport trade secrets was wrong.

5. Flexport welcomes fair competition, even from former employees. But the actions of Freightmate and its founders were anything but fair—they were unlawful. To this day, Defendants continue to possess Flexport's immensely valuable intellectual property, obtained in violation of federal and state law, as well as contractual duties toward Flexport. Flexport brings this lawsuit to vindicate its rights, recover its stolen property, and enjoin Defendants from disclosing or using Flexport's proprietary information.

## THE PARTIES

6. Plaintiff Flexport is a corporation incorporated in Delaware and headquartered in San Francisco. Flexport's principal place of business is 760 Market Street, 8th Floor, San Francisco, California 94102.

7. Defendant Freightmate is a corporation incorporated in Delaware. Plaintiff believes and therefore alleges that Freightmate's principal place of business is 3120 139th Ave SE Office 5-113, Bellevue, Washington 98005.

8. Defendant Yingwei (Jason) Zhao is an adult individual. Plaintiff believes and therefore alleges that Zhao co-founded Freightmate and serves as its Chief Operating Officer. Plaintiff believes and therefore alleges that Zhao resides in Newcastle, Washington.

9. Defendant Bryan Lacaillade is an adult individual. Plaintiff believes and therefore alleges that Lacaillade co-founded Freightmate and serves as its Chief Executive Officer. Plaintiff believes and therefore alleges Lacaillade resides in Seattle, Washington.

## JURISDICTION AND VENUE

10. Flexport brings this action pursuant to 18 U.S.C. §§ 1836, et seq. (the Defend Trade Secrets Act). The Court has subject matter jurisdiction over Flexport's claims pursuant to 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1836(b)(1) (original jurisdiction for DTSA claims).

11. The Court has supplemental jurisdiction over asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

12. The Court has personal jurisdiction over Defendants Zhao and Lacaillade because they consented that San Francisco County courts have exclusive jurisdiction over all disputes between the parties relating to Flexport's intellectual property.

13. This Court additionally has personal jurisdiction over Defendants based on their purposeful availment and connections to California and this District, including those that relate directly to and form the basis of the claims described in this Complaint. Plaintiff believes and therefore alleges that Defendants conspired to obtain and exploit Flexport's proprietary information knowing that the information is secured and managed from Flexport's San Francisco headquarters. Plaintiff believes and therefore alleges that Defendants committed their misappropriation using servers and services of third parties based in this District. Plaintiff believes and therefore alleges that Freightmate directly or through intermediaries, makes, distributes, offers for sale or license, sells or licenses, or advertises its products and services in the State of California and the Northern

District of California. For example, Defendants advertise Freightmate's products and services online at www.freightmate.ai, which is accessible in this District. Plaintiff believes and therefore alleges that Defendants wrongfully used and continues to so use Flexport's intellectual property to offer to sell and sell products and services to Flexport's actual or potential customers and partners in California and this District. Plaintiff believes and therefore alleges that Defendants acted with knowledge that the harm from their actions targeting Flexport would be suffered in this District, where Flexport is headquartered.

14. Based on Defendants' conduct, it was wholly foreseeable that they would be bound and subject to a suit in the Northern District of California.

15. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), because this is a judicial district in which Defendant is subject to the Court's personal jurisdiction with respect to this action.

## DIVISIONAL ASSIGNMENT

16. This is an action for trade secret misappropriation and related claims, where a substantial part of the events or omissions that give rise to the claims occurred in San Francisco County. Further, Defendants' conduct breached contractual obligations that contemplated resolution of disputes in San Francisco County. Thus, pursuant to Civil L.R. 3-2, this action should be assigned to the San Francisco Division.

## FACTUAL ALLEGATIONS

### A. Flexport is a San Francisco technology company whose innovations continue to disrupt the global logistics industry.

17. Flexport was founded in 2013 in San Francisco to remove roadblocks that challenge companies engaged in global trade. From its earliest days, Flexport's approach has involved combining automation with human expertise. More than 10,000 customers trust Flexport with their respective supply chains, from emerging brands to Fortune 500s, shipping nearly $19 billion of merchandise across 112 countries with Flexport technology in 2021.

18. Flexport has been described as "a tech-enabled freight forwarder." A freight forwarder tackles the complexity required to move freight across a network of logistics asset

owners. Moving goods from Point A to Point B, particularly across international boundaries, often involves over a dozen actors. For instance, there is usually a factory, an importer, a warehouse, a trucking company in the exporting country and another in the importing country, ports, custom brokerages, ocean carriers, insurance companies, equipment providers, and lenders. It is economically unviable for one firm to own all these assets, and so, on any given shipment, freight forwarders assemble and help engage the multiple asset owners needed. Flexport's innovative products and services simplify customers' management of these processes so that the customers can operate more efficiently and profitably.

**B. Flexport's intellectual property is critical to its success.**

19. Flexport's technological innovations and improvements drive Flexport's success. Flexport invests heavily in its engineering and business teams' creation of industry-leading technologies and related products and services. Since 2013, Flexport has invested over hundreds of millions in research and development, including to generate the intellectual property at issue. Automation and artificial intelligence are central to Flexport's products, and Flexport has invested heavily to develop AI products, including those at issue.

20. Flexport's "Core" and the Flexport Forwarding App (FFA) are two freight management systems that Flexport developed to manage operations, automate workflows, and optimize costs. The systems work together with the Flexport Client App, which allows Flexport customers secure access to information specific to them and their shipments. These tools, along with additional apps for Flexport's importers and exporters, constitute the Flexport Platform. The Flexport Platform allows users to obtain quotes, request and book shipments, track global freight movements in real-time, manage product data, visualize supply chains, view analytics, and so on. The Flexport Platform includes features for ingestion of data, analyzing the information, digitization of the information, and automation.

21. Flexport developed and deployed FFA as a successor to Core. FFA implements a "Zero Touch" framework, where the user defines the eligibility for work items to be automated, and then Flexport's proprietary technology provides a tailored experience that allows the user to direct their focus only on aspects of their shipment that they opted not to automate. Development

of FFA, including the proprietary technology that drives its Zero Touch capabilities, began in 2021, and since that time, Flexport has invested many millions toward its development.

22. Details regarding the inner workings of the Flexport Platform constitute Flexport trade secrets. In particular, the source code, architecture, algorithms, methods, design, distribution, capabilities, and operation of this platform are all nonpublic (including the data used to feed and teach the software), and are maintained in strict confidence. This information derives considerable value from not being known outside of Flexport and offers Flexport a significant competitive advantage over its competitors.

23. This case concerns Copyrighted Flexport Platform Source Code, Flexport Platform Trade Secrets, which include the Flexport Proprietary Datasets for Training Automated Freight Management Tools, and Flexport Business and Operational Trade Secrets.

24. <u>Copyrighted Flexport Platform Source Code</u>. Flexport's source code relating to internal and external Flexport products is proprietary to Flexport, not public, and contains Flexport's trade secrets. This information is not discernable from public sources. For example, public sources do not disclose the details regarding how the Flexport Platform helps document, track, and connect the global trade ecosystem on a single platform—including buyers, sellers and logistics companies. This information took years of development work and allows Flexport to offer its customers an unprecedented level of visibility into and control over granular and accurate real-time details about shipments.

25. Flexport also owns the copyrights in its source code. For example, a version of the Flexport Platform source code is registered with the United States Copyright Office as U.S. Copyright No. TXu 2-473-064, with an effective date of registration of March 6, 2025.

26. <u>Flexport Platform Trade Secrets</u>. Flexport's proprietary algorithms, methods, project plans, roadmaps, operation, capabilities for ordering, organizing, and tracking shipments, and Flexport's proprietary pricing information relating to the Flexport Platform constitute Flexport's trade secrets. This information is not discernable from public sources. For example, public sources do not disclose Flexport's specialized process to digitize and structure customer supply chain data for use with the Flexport Platform. Likewise, public sources do not disclose

Flexport's proprietary datasets and algorithms that allow Flexport to make and provide data-driven shipping services, shipping operations, and logistics planning services for manufacturers and retailers worldwide. This information took years of development work and allows Flexport's customers to save considerable time and money in the shipping of products worldwide.

27. Flexport Freight Datasets for Training Automated Freight Management Tools (part of Flexport Platform Trade Secrets). These datasets comprise Flexport's unique collection of freight documents like packing lists, commercial invoices, bills of lading, booking confirmations, arrival notices, importer filings, delivery orders, and customer forms. This information is not discernable from public sources. For example, public sources do not disclose Flexport's expansive and logically organized datasets containing sensitive shipment, logistics and related information. These trade secrets derive independent economic value from their confidentiality, and from the comprehensive nature of the datasets, which include forms and data covering the full spectrum of logistics and freighting operations. Flexport values its unique selection of documents (and the particularly formatted data and information therein) that are most desirable for use as training materials for modern automated tools, for example, because the datasets reflect the documentation practices of a cross-section of industry participants and stakeholders located across geographies and industries. The Flexport Freight Datasets trade secrets also comprise Flexport documents that tabulate, describe and explain the identity, composition and usage of the freight documents, which further increase the value of these trade secrets. These proprietary datasets were painstakingly developed and compiled by Flexport in the course of its business operations over many years of work, are immensely valuable for creating and testing such automated tools, and are generally unavailable to newcomers to the field. Flexport relies on these trade secrets to continue improving its specialty products, services, and client relationships.

28. Flexport Business and Operational Trade Secrets. Flexport's playbooks for technology integrations, its internal library of standard operating procedures, handbooks, documentation regarding training offerings that Flexport provides as services, internal training materials, competitive research documents, and marketing strategies constitute Flexport's trade secrets. This information is not discernable from public sources. For example, public sources do

not disclose the expert consultation and advice that the Flexport team provides customers in areas such as integration of their systems, customized configurations, screening and working with specific partners, vendors, supply chains, and adapting to various industry invoicing methodologies. Similarly, public sources do not disclose Flexport's library of standard operating procedures documentation that standardizes Flexport's hard-won experience in all these areas and that Flexport employees leverage in serving the company's customers. Likewise, public sources disclose neither the factors nor the intelligence Flexport considers for making informed decisions regarding the development of new products or services, operations across geographies and sectors, and other critical aspects of Flexport's business. These aspects include considerations for whether and how Flexport should operate or partner with persons in a territory, as well as best practices and guidelines to help the company build and retain goodwill, and to communicate honestly and precisely about its offerings to actual or potential customers. This deep well of information is the result of years of research and of Flexport documenting and refining its practices. It allows Flexport to continue improving its products and services, and growing its business.

29. The Copyrighted Flexport Platform Source Code, Flexport Platform Trade Secrets, including Flexport Freight Datasets trade secrets, and Flexport Business and Operational Trade Secrets are not publicly known nor readily discoverable outside of Flexport.

**C. Flexport takes extensive and diligent measures to protect its proprietary information.**

30. Flexport employs a variety of different methods to protect itscommercially sensitive and proprietary information, including the trade secrets at issue.

31. For example, Flexport requires promises of non-disclosure and non-misuse before disclosing any confidential information. Flexport requires its employees to sign and be trained in an Employee Inventions & Proprietary Information Agreement ("Agreement"), an Acceptable Use Policy ("Policy"), a Flexport Employee Handbook ("Handbook"), and a C-TPAT Code of Conduct ("Code"). The Agreement requires employees to "hold in strict confidence and not directly or indirectly disclose or use any Proprietary Information, except as required within the scope of [their] employment," and upon termination of employment, to "promptly identify and, as directed by the

Company, destroy, delete or return to the Company all items containing or embodying Proprietary Information (including all original or copies of content, whether in electronic or hard-copy form)." The Policy states that employees "must preserve the confidentiality" of company data, and that employees "may access, use or share Flexport proprietary information only to the extent it is authorized and necessary to fulfill [their] assigned job duties." The Handbook provides guidance for employees to ensure that Flexport's trade secrets remain protected. Under the section "Basic Rules of Conduct," the Handbook prohibits "[u]nauthorized disclosure of business 'secrets' or confidential information." The Code confirms that "[a]ll customer and company information and computer data belongs to the company and shall not be copied, transmitted or shared with anyone outside of Flexport or their active business partners."

32. All Flexport employees are provided copies of the above obligations. Every employee is required to participate in security training when joining the company and to receive ongoing training throughout their Flexport careers. Topics covered include device security, acceptable use, preventing spyware/malware, identifying and reporting phishing emails, physical security, data privacy, account management and incident reporting, among others. Similarly, in dealing with customers and third-parties, Flexport requires execution of non-disclosure or confidentiality agreements before granting access to confidential information.

33. Flexport also relies on technological security measures, including, but not limited to, a sophisticated information security management system. For example, Flexport issues company devices to its employees, which include end-point security software to secure the Flexport ecosystem. Further, access to Flexport proprietary information is controlled. Flexport allows access only on a "need-to-know" basis, while adopting the "least privileged" approach, which means that access is denied by default, absent a showing of need. Similarly, the Flexport Platform was designed to include stringent access control measures that allow Flexport to define who, within or outside the company, may access any document or category of document. Flexport uses these access control tools diligently and trains its employees on them. Across its systems, Flexport deploys industry-standard tools for multi-factor authentication, and Flexport employees must utilize strong passwords that comply with predefined parameters. Furthermore, Flexport implements multiple

Intrusion Detection/Prevention Systems (IDS), including host-based firewalls, network-based IDS, host-based IDS, and file integrity monitoring. With some narrow exceptions, only Flexport-issued devices are permitted to access Flexport's confidential and trade secret information, and use of removable or external storage devices (e.g., USB flash drives, and personal cloud storage) is prohibited. Flexport obtained SOC 2 certification after an audit by an independent third-party auditor who validated Flexport's systems, applications, people, and processes.

34. Flexport has an Information Security team based in San Francisco. This team is tasked with preventing, detecting, and investigating any unauthorized access, duplication, or disclosure of Flexport's confidential information. The team implements industry-leading tools to perform these tasks.

**D. Flexport Entrusted Lacaillade and Zhao with Flexport's trade secrets.**

35. Defendants Zhao and Lacaillade are both former employees of Flexport. Zhao joined Flexport on June 1, 2021, as Principal Technical Program Manager. He remained in this role until his departure from Flexport on June 4, 2024. Lacaillade joined Flexport on October 18, 2021, as Group Product Manager. He was promoted to Director, Product Manager, with effect from April 1, 2024, and remained in this role until his departure from Flexport on May 10, 2024.

36. Both Zhao and Lacaillade were original members of the team tasked with developing FFA and its automation tools. Zhao and Lacaillade held themselves out to be the Head of Freight Management System ("FMS") Implementation at Flexport and the Director and Head of FMS Product at Flexport, respectively. *See* FUSE_000001. Both promised to protect, and not misuse, Flexport's trade secrets. Each of these former Flexport employees agreed to Flexport's Agreement, Policy, Handbook, and Code described above. Each employee also accepted a "responsibility to promptly report the theft, loss or unauthorized disclosure of Flexport proprietary information."

37. Pursuant to their offer letters, both Zhao and Lacaillade agreed that "While you render services to the Company, you will not engage in any other employment, consulting or other business activity (whether full time or part-time) that would create a conflict of interest with the Company." Both Zhao and Lacaillade were granted 75,000 restricted stock units (RSUs) as part of

their original employment, with Lacaillade receiving an additional 9,100 RSUs through his promotion to Director, Product Manager and Zhao receiving an additional 6,400 RSU's in March 2024. Lacaillade also received an equity grant in the form of 29,000 shares of stock in Flexport in December 2023.

38. However, as detailed below, Zhao and Lacaillade conspired and acted to breach their contractual and fiduciary obligations owed to Flexport for their own benefit and that of their company, Freightmate.

**E. Defendants misused Flexport proprietary information and resources unlawfully in creating their competing business.**

39. Plaintiff believes and therefore alleges that, no later than October 2023, Lacaillade and Zhao agreed to create Defendant Freightmate while working for Flexport. Plaintiff believes and therefore alleges that Lacaillade and Zhao further agreed and acted to compete unfairly with Flexport by secretly using Flexport proprietary systems, information, personnel, and other resources to advance Freightmate's business interests. Plaintiff believes and therefore alleges that, at least as early as October 2023, both Lacaillade and Zhao decided to leave Flexport to pursue Freightmate, but agreed to conceal this decision and delay their departure from the company to unjustifiably preserve their access to Flexport's secure systems and trade secrets.

40. For example, on October 15, 2023, Lacaillade texted a person with a 443 area code that he was "Looking to potentially start something with 2 of my co-workers that I joined Flexport with," "Basically building the same tech we are building for Flexport as a SaaS for other freight forwarders." *See* LACAILLADE0000313. Plaintiff believes and therefore alleges that Lacaillade was referring to what would later become Freightmate with Zhao as one of the referenced co-workers. Lacaillade then stated that he "genuinely enjoy that work as opposed to building cool shit just for flexport to benefit" and was "[w]ay more excited about this work than Flexport work lol."

41. On or before October 19, 2023, and unbeknownst to Flexport, Zhao and Lacaillade joined a WeChat group—an instant messaging and social platform—with five total members named "$100BN Company Founders." *See* Zhao00062870. On October 19, 2023, one of the other members directly referenced Flexport's Agreement, messaging: "There's an Exhibit A section in

the offer, it's way too complicated, not sure what's covered…" *See* Zhao00062871. On October 21, 2023, Lacaillade responded "I'll take a look tomorrow 👍 👍". *Id.*

42. On October 23, 2023, Zhao complained in the $100BN Company Founders WeChat that "Flexport doesn't allow to install WeChat desktop version? Hard to type using the mobile app," to which another member instructed Zhao on how to work around Flexport's security to download the WeChat application directly on his Flexport computer without Flexport's authorization. Zhao00062872. Zhao responded "👍". Six minutes later, Zhao sent a long message with an idea for a "logistics domain specific messenger app or plugin" and called Flexport's logistics domain "very basic and not smart at all" and "so painful." Zhao00062873. Plaintiff believes and therefore alleges that Zhao's lengthier message indicates that he downloaded the WeChat application to his Flexport computer against Flexport's protocols to send his ideas for a logistics domain to be used at what would become Freightmate.

43. On October 25, 2023, Lacaillade messaged the $100BN Company Founders WeChat to set up "a group meeting next week" to discuss what would become Freightmate, while simultaneously cancelling a bi-weekly review meeting for Flexport. *See* Zhao00062876-62877.

44. On November 11, 2023, Lacaillade messaged the $100BN Company Founders WeChat about using "ai" in a company name to "build momentum and get attention from investors." *See* Zhao00062879-62880. Plaintiff believes and therefore alleges that this is the origin of "ai" in Freightmate AI, Inc.

45. On December 7, 2023, another member in the $100BN Company Founders WeChat messaged that "The existing Flexport system is a shit hole..." and asked "Bryan, take us out of here," referring to Lacaillade. *See* Zhao00062882. Lacaillade responded "Hahah," "Let's make this happen!", and "I'm setting up a bunch of partner interviews to help us identify the top problem to solve so we can start thinking about a pilot 😊". *See id.* Lacaillade further stated "We need to think of a catch [sic] name as well that is really cool and has ai in it. I'll do some brainstorming with chat gpt." *See* Zhao0062883. One suggested name was Shadow AI.

46. On December 8, 2023, Lacaillade messaged the $100BN Company Founders WeChat asking to "sync up about the name next week and see what we like. I'll connect with some

of my friends that are in branding to get some ideas/feedback as well 👍". *See* Zhao00062889. Zhao also suggested names.

47. On December 10, 2023, Lacaillade messaged the $100BN Company Founder WeChat that he "got some good feedback from my startup branding friend." *See* Zhao00062894. Based on that advice, Lacaillade suggested "I think we can use Shadow AI as an internal name for ourselves so we have something to call our venture, and then once we have a working product and get closer to go-to-market we can work to finalize a name/branding 👍." *See* Zhao00062895.

48. On December 13, 2023, Lacaillade messaged the $100BN Company Founder WeChat his "notes from today," which included five points: (1) "Bryan is in process of setting up partner shadow sessions. Will extend invite to group as I get them set up. Targeting 12-15 ideally;" (2) "Ye is going to set up a personal Slack for us so we don't need to use WeChat;" (3) "We cannot use Flexport resources for anything as we build this out based on our offer letter. We just need to keep this in mind 👍;" (4) "I will visit Bellevue the week of 1/16, and we will spend time the week of 1/20 at Leo's mansion identifying what our first solution will be;" and (5) "We all need to download our offer letters so we can compare the wording in person. From there we can leverage legal guidance to ensure we prevent getting sued 😊 here is the legal guidance I found: https://www.legalzoom.com/attorneys/." *See* Zhao00062897-62898.

49. The timestamps in the WeChat group, which Plaintiff understands was used from October to December 2023, show that many of the communications occurred during Flexport business hours—yet pertained to business for what would become Freightmate.

50. On December 13, 2023, three of the five WeChat group members, including Zhao, joined the new Slack chat room named "#100bn-startup." The next day the last two members, including Lacaillade, joined. *See* LACAILLADE0000161.

51. On December 15, 2023, a Shadow AI workspace was set up on Slack—the cloud-based collaboration tool used for team communication. *See* LACAILLADE0001605.

52. On that same day, Lacaillade uploaded a Google Doc titled "Flexport Offer Letter Proprietary Information Agreement" to the #100bn-startup Slack chat with the following message:

/ / /

> FYI I copied the Proprietary Information Agreement from my Flexport offer letter to this doc. This is the section that contains all the non-compete stuff. When you guys get a min, can you please check to see if your offer has the same verbiage and let me know? I have a hunch they are all the same since I doubt they would customize per offer. If they are all the same, then if you guys are ok with it, I will reach out to LegalZoom to accelerate getting legal feedback ahead of our Jan 16th kickoff which I think is important since that will help dictate what we can/can't do 👍 .

*See* LACAILLADE0000162. The message is listed as "edited," but Plaintiff is unable to ascertain the exact edit. Zhao is among the two participants that replied to Lacaillade's message, but Plaintiff is unable to ascertain his exact reply.

53. On December 18, 2023, Lacaillade linked a Mino board—"a visual workspace for innovation where teams manage projects, design products, and build the future together"—to the #100bn-startup Slack chat so that they could "start adding opportunities for our first use case ahead of our January kickoff." *See* LACAILLADE0000163.

54. On December 22, 2023, Lacaillade uploaded a Google Sheet titled "Shadow AI Reference Sheet" to the #100bn-startup Slack chat with the message:

> Hey team, I did some competitive benchmarking today to see what other companies are working on ai/automation-type solutions for freight forwarders. The "Competitive Landscape" tan in this sheet highlights the key companies I could find with some general info and links [Emoji].

*Id.* The message is listed as "edited," but Plaintiff is unable to ascertain the exact edit.

55. On January 16, 2024, Lacaillade messaged the #100bn-startup Slack chat reminding everyone to "if you can check the wording in your offer letter to see if it is the same as mine above that would be awesome 👍so far @ Jason Zhao has confirmed it is the same." *See* LACAILLADE0000164. The Slack chat goes on to detail the agenda for their in-person meeting in Bellevue, Washington on January 20, 2024.

56. Beginning in January 2024, Lacaillade also began scheduling frequent and regular meetings with Zhao during Flexport business hours, using Flexport's computer systems—as opposed to the $100BN Company Founder WeChat and #100bn-startup Slack chat detailed above.

/ / /

57. Starting with these meetings in January 2024, Plaintiff believes and therefore alleges, Lacaillade and Zhao were acting in concert to extract Flexport confidential information and trade secrets that they could use for the benefit of what would later become Freightmate (then internally referred to as Shadow AI). For example, as detailed below, Plaintiff believes and therefore alleges that Lacaillade and Zhao (under the false pretense of acting on behalf of Flexport) pursued meetings with diverse Flexport personnel to gather technical insights regarding customer "pain points" that Freightmate could exploit in its competitive product, while also frequently meeting one-on-one to discuss their plans, while also studying and copying Flexport trade secrets.

58. Although Zhao and Lacaillade's actions in creating and pursuing this business while employed by Flexport created a conflict of interest with their employment at Flexport—and both employees were contractually obligated to disclose such a conflict to Flexport—neither did. Through non-disclosure of their conflict and moonlighting, Lacaillade and Zhao dishonestly and unjustifiably retained access to Flexport's expertise and its secure data storage systems and trade secrets.

59. Plaintiff believes and therefore alleges that Lacaillade scheduled at least six one-on-one meetings with Zhao in January 2024. This included 30-minute meetings on each of January 2, January 23, January 29, and January 31, with none of these meetings indicating the purpose of the meeting in the calendar entries' subject lines. Although these meetings were scheduled and conducted using Flexport systems, Plaintiff believes and therefore alleges that they pertained to Freightmate business.

60. For example, Lacaillade accepted an invitation from Nicole Wischoff, a venture capitalist specializing in pre-seed funding, to discuss him leaving Flexport to start his own company. *See* LACAILLADE0000463. The meeting took place at 12:30 p.m. Eastern Time on Tuesday, January 23, 2024 during Flexport business hours. LACAILLADE0000463. The meeting went well enough that Lacaillade immediately messaged the #100bn-startup Slack chat the following message at 12:55 p.m. Eastern Time:

> Just had an awesome call with the VC fund owner!! She gave some fantastic feedback and wants to be kept in the loop as we make progress with our idea.

> She said she'd be willing to help us prep for a funding round and would invest with us if we can make a compelling case [Emojis].

LACAILLADE0000171. Zhao replied to Lacaillade's message, but Plaintiff is unable to ascertain his exact reply.

61. For further example, Lacaillade sent Zhao an invitation for a meeting on Monday, January 29, 2024, from 10:00–10:30 am Pacific Time. The invitation did not mention the purpose of the meeting. The day before, on January 28, 2024, Lacaillade confirmed in the #100bn-startup Slack chat that he had purchased the Freightmate.ai domain name. *See* LACAILLADE0000172.

62. Lacaillade sent Zhao a similar invitation for a meeting on Wednesday, January 31, 2024, from 1:30–2:00 pm Pacific Time. Again, the invitation did not mention any purpose for the meeting. Shortly after the meeting, Plaintiff believes and therefore alleges that Zhao created a secret file in his Flexport work account on Google Sheets called "FFA Plan," and copy-pasted Flexport data into that personal file, including Flexport Platform Trade Secrets. Plaintiff believes and therefore alleges that Zhao later used his Freightmate device to log into the account and download this information onto his device for Defendants' benefit. Plaintiff believes and therefore alleges that on multiple subsequent occasions between February 1 and May 13, 2024 (when Lacaillade and Zhao co-founded Defendant Freightmate), Zhao used this approach to first gather or stage materials to copy on his Flexport work account with Google, and then copied the materials into storage mediums he controlled. As follows, Plaintiff believes and therefore alleges that Zhao stole volumes of highly confidential Flexport information and trade secrets in this manner.

63. In February 2024, Plaintiff believes and therefore alleges that Lacaillade and Zhao intensified their work on Freightmate business, scheduling approximately twelve one-on-one meetings that month using Flexport systems. For example, Lacaillade invited Zhao to a meeting on February 1, 2024, from 9:00–9:30 am Pacific Time, this time to discuss "Roadmap Planning." Again, after the meeting, Zhao copy-pasted material into the secret "FFA Plan" file in his Flexport work account on Google Sheets, which he would later download.

64. Defendants also spent February reaching out to a diversity of Flexport operations experts, to pick their brains for information to benefit Defendants' planned venture. For example,

on February 2, 2024, Lacaillade sent meeting invitations to four Flexport operations experts, purporting to "collect feedback" from them on Flexport's FFA product, including soliciting their "thoughts on FFA" products. Zhao was invited to all the meetings. Plaintiff believes and therefore alleges that Lacaillade scheduled these meetings to collect Flexport expertise and product development ideas to implement in his Freightmate venture with Zhao.

65. Lacaillade scheduled additional meetings for himself and Zhao on February 5, February 6, February 7, February 13, February 21, February 23, February 26, and February 28. As previously, the meeting invitations generally concealed the purpose of the meeting, but Plaintiff believes and therefore alleges that they were scheduled to discuss Freightmate business while accessing Flexport systems. For example, before their meeting on February 7, Lacaillade messaged Zhao using Flexport's Slack communication channel that he "set up time for us today to go through the Freight Tech priority list and start to create the more detailed plans ~~" (emphasis added). Plaintiff believes and therefore alleges that the "more detailed plans" Lacaillade and Zhao intended to "start to create" related to Freightmate business—not Flexport's.

66. Plaintiff believes and therefore alleges that Lacaillade did not merely know about Zhao's unauthorized downloads but intentionally facilitated them. For example, Plaintiff believes and therefore alleges that, on February 15, 2024, Lacaillade sent an email providing Zhao with access to a document called "FFA Automation Update," comprising Flexport Platform Trade Secrets. Plaintiff believes and therefore alleges that Zhao referenced and downloaded this document on multiple occasions thereafter, including downloading the file for Defendants' benefit on May 31, 2024, shortly before he left Flexport.

67. Lacaillade scheduled another meeting for himself and Zhao on February 21, 2024, at 10:00–11:00 am, ostensibly regarding "Review automation slides." Later that day, Plaintiff believes and therefore alleges that Zhao copied additional Flexport trade secrets into "FFA Automation Update," which he downloaded to his computer on May 31, 2024, shortly before leaving Flexport.

68. In early to mid-February 2024, Lacaillade also created a working document in his personal Google drive entitled "freightmate ai PRFAQ." Plaintiff believes and therefore alleges

that Lacaillade and Zhao used this document as a further roadmap for Freightmate's "Minimum Viable Product (MVP)." *See* Zhao00062810, Zhao00062814. Plaintiff further believes and therefore alleges that Lacaillade and Zhao actively worked on this document during Flexport business hours rather than spend their time working on their assigned matters at Flexport. *See id.*

69. On or about February 23, 2024, Lacaillade subscribed to Balsamiq Cloud, which is a web-based wireframing tool designed for rapid user interface (UI) design and real-time team collaboration, and invited Zhao to collaborate on an instance called "Bryan's Space." *See* Zhao00062805. After inviting Zhao, Lacaillade created project called "freightmate MVP" and created numerous wireframes with Zhao between February 27 and 28, 2024. *See* Zhao00062808, Zhao00062812; LACAILLADE0000176-77.

70. By March 2024, Plaintiff believes and therefore alleges that Lacaillade and Zhao were more focused on their work for what would become Freightmate than their work at Flexport. For example, on March 4, Lacaillade sent a text message to who Plaintiff believes is Zhao, stating "Man it's 'tough to focus on Flexport work when I'm so much more excited about the freightmate." LACAILLADE0000320.

71. Plaintiff also believes and therefore alleges that Lacaillade and Zhao continued their clandestine work for Freightmate in March 2024. Plaintiff believes and therefore alleges that the Freightmate co-founders scheduled eight one-on-one meetings while accessing Flexport systems, on March 1, March 4, March 11, March 12, March 13, March 14, March 18, and March 28. For example, during a March 11, 2024, meeting between 12 and 12:30 pm Pacific Time, Plaintiff believes and therefore alleges that Lacaillade and Zhao met to discuss, and at approximately 12:18 pm Pacific Time, secretly download (through Zhao) a confidential Flexport business review document called "LSA WBR 2022," comprising Flexport Platform Trade Secrets. This document is an identification of key internal and client-facing business metrics, and a compilation of Flexport data on those metrics for use in proactively identifying issues in client delivery across business units. The data includes tabulated information on common engineering issues and automation targets and achievements across the company—data Plaintiff believes and therefore alleges Defendants exfiltrated to exploit as Freightmate.

72. Likewise, both before and after a March 12, 2024, meeting between 1 and 2 pm Pacific Time, Plaintiff believes and therefore alleges that Zhao accessed and modified a document containing Flexport Platform Trade Secrets called “FFA Import Work Items (EMEA Requirement Collection),” which he also copied shortly after the meeting. During the meeting, Plaintiff believes and therefore alleges that Lacaillade and Zhao viewed (through Zhao) multiple other Flexport documents relating to FFA import work items, downloading one. As another example, Plaintiff believes and therefore alleges that, minutes before a March 28, 2024, meeting between 9 and 10 am Pacific Time, Zhao again accessed and modified the “FFA Import Work Items (EMEA Requirement Collection)” document, and copied it again shortly after the meeting. Plaintiff believes and therefore alleges that this document was invaluable in Defendants’ work developing freight forwarding industry document management products, as it exhaustively tabulates hundreds of steps that need to be performed in freight forwarding management by air, sea, or ground, relevant considerations, and corresponding documentation activity. Indeed, Zhao consulted this document constantly, downloading or editing it almost every workday up until his departure, and downloading it repeatedly on his last day, June 4, 2024.

73. Similarly, Plaintiff believes and therefore alleges that, after a meeting regarding Freightmate business on Flexport systems on March 18, 2024, Zhao messaged Lacaillade privately using Flexport’s Slack communication channel that the “number of work item instances in a shipment is more than 500,” linking a file containing Flexport Platform Trade Secrets and located at “https://flexport.looker.com/explore/ffapp_model/applicable_work_items,” which is a file that Plaintiff believes and therefore alleges that Zhao copied without authorization for Defendants’ benefit to understand the scope of freight forwarding documentation. After these exchanges, Zhao spent his evening looking through Flexport files of shipping documents and related instructional materials comprising Flexport Platform Trade Secrets and Flexport Business and Operational Trade Secrets, such as “Shipment Documents,” “Training Materials,” “Shipment Lifecycle” documents, “Operations Bootcamp Sessions,” “Flexport Training Manuals,” “Projects & Programs,” “Workflow Resources.” Zhao then downloaded over 250 documents in these areas, including documents about Flexport’s commercial invoicing practices (“Sample Commercial Invoice /

Packing List”), and Flexport standard procedures (“Core Inbox - SOP.docx”).

74. In March 2024, like in the preceding month, Plaintiff believes and therefore alleges that Lacaillade again reached out to several Flexport operations experts to gather non-public insights into key problems and opportunities in Flexport products that Lacaillade and Zhao could exploit as Freightmate. For example, on March 5, 2024, Lacaillade requested and scheduled meetings with at least four Flexport global operations personnel, seeking insights regarding how they used Flexport’s FFA product, and any problems or opportunities they perceived relating to it. On March 5 and 6, 2024, Lacaillade requested and scheduled meetings with at least three more Flexport employees, requesting a “Deep Dive” with each person to “Review key pain points” and gather information on the “most time intensive” activities or tasks in their use of Flexport tools in their export-related work areas. Lacaillade invited Zhao to all these meetings.

75. Plaintiff believes and therefore alleges that, on or about March 15, 2024, Zhao used his browser’s “INCOGNITO” mode to copy-paste information relating to FFA, from a file titled “ffapp_model_applicable_work_items 2024-03-11T1152.csv.” This is a proprietary Flexport customer list that contains a list of Flexport customers that Flexport’s nonpublic and proprietary database identified as “Active” clients. Plaintiff believes and therefore alleges that Zhao’s efforts to conceal his exfiltration of these Flexport trade secrets shows that he knew what he was doing was wrong.

76. In March 2024, Lacaillade and Zhao also continued to work on laying the foundation for Freightmate and developing its MVP rather than direct their full attention to their Flexport duties. On or about March 10, 2024, Lacaillade shared a Google document titled “freightmate Weekly Stand-up Agenda + Next Steps” from his personal Google account Zhao meant to “capture updates/topics/next steps for our freightmate standups.” *See* Zhao00062789, Zhao00062804.

77. Between March 12 and 25, 2024, Plaintiff believes and therefore alleges that Lacaillade and Zhao continued to work on Freightmate business during Flexport work hours, including, for example, working together planning the Freightmate logo.

78. At 1:37 p.m. Pacific Time on March 12, 2024, Lacaillade shared another document from his personal Google account with Zhao titled, “Requirements for Initial Capabilities.” *See*

Zhao00062783. Plaintiff believes and therefore alleges that Lacaillade and Zhao used this document to further develop Freightmate's MVP while both were still employed at Flexport. *See* Zhao00062784.

79. On March 25, 2024, Lacaillade sent Zhao a link through the Flexport Slack app to a Google Slide Presentation, "Knowledge Management: Discovery Research." Lacaillade noted to Zhao, "There is the KM Research 👍." Within minutes, Zhao downloaded the document and messaged back that the document had "many good insights but it obviously shows no good product/solution to solve it 😞 ". Lacaillade responded, "Yep 😊". Plaintiff believes and alleges that this is yet another example of Lacaillade and Zhao mining Flexport trade secrets and intellectual property to use for Freightmate's benefit. Indeed, the "Knowledge Management: Discovery Research" document was Flexport's non-public compilation and detailed analysis of research on users' "current day-to-day realities, behaviors, and pain points," and opportunities with respect to data structure, data management, and automation—the same focus as Freightmate's initial product.

80. On or about March 28, 2024, Lacaillade and Zhao began using Figma Professional, a cloud-based, collaborative design tool used to create user interfaces (UI), user experiences (UX) and interactive prototypes. *See* Zhao00062757. Plaintiff believes and therefore alleges that, Lacaillade and Zhao utilized Figma to continue developing Freightmate's MVP while still employed by Flexport. *See* Zhao00062753.

81. On April 1, 2024, Lacaillade was promoted to Director, Product Manager at Flexport. Lacaillade would not have received this promotion had he disclosed in January 2024 (or at any time prior to April 2024) that he and Zhao had (1) secretly decided and started working on Freightmate products and business in competition with Flexport; (2) been sourcing non-public and commercially valuable product development ideas from Flexport experts for exploitation as Freightmate; and (3) been meeting frequently while accessing Flexport's secure systems to conduct Freightmate business and, without authorization, access and download volumes of confidential and trade secret Flexport files.

/ / /

82. On or about April 2, 2024, Plaintiff believes and therefore alleges that Zhao copied trade secret information into a Google Sheets document containing Flexport Platform Trade Secrets and named "freight_forwarding producer_work_item_types_mapping." Plaintiff believes and therefore alleges that Zhao consulted this file again before or after scheduled meetings with Lacaillade on April 22, May 3, and May 6, before downloading the file from his Flexport work account on Google Sheets on May 23, 2024.

83. Plaintiff believes and therefore alleges that by early April 2024, Zhao and Lacaillade had sufficiently honed a business plan for Freightmate and laid the foundation for its MVP product, and sought to reconnect with Ms. Wischoff to obtain funding for Freightmate.

84. On or about April 16, 2024, Lacaillade sent Ms. Wischoff a slide deck "to help share more details about our plan and next steps" in preparation for a meeting with her the following day. *See* NW_GP_II-Flexport_0000316.C. Plaintiff believes and therefore alleges that Lacaillade met via video conference with Ms. Wischoff during Flexport business hours on April 17, 2024, and as a result of that meeting, Ms. Wischoff decided to invest in Freightmate.

85. On April 18, 2024, Lacaillade sent an email to Ms. Wischoff informing her that "[w]e are accelerating our start times" where Lacaillade would give notice on April 19, 2024 with his last day at Flexport being May 10, 2024. *See* Zhao0001457. However, Zhao would be staying on until June 3, 2024 because he had "some sizable RSU grants vesting on 6/1." *Id.* Lacaillade also informed her that "[w]e would like to move forward with the early funding that we discussed" and that he would be travel to Bellevue, Washington to meet with Zhao to provide additional information requested by Ms. Wischoff. *See id.*

86. On April 19, 2024, Lacaillade sent a Google Meet invite to Zhao and Ms. Wischoff for 8:00 a.m. through 9:00 a.m. Pacific Time to "1) review the frieghtmate projected burn rate, 2) discuss the pre-seed number, and 3) align on next steps." *See* Zhao00062737

87. On April 22, 2024, Plaintiff believes and therefore alleges that Zhao and Lacaillade had an appointment to tour office space in Bellevue, Washington, for Freightmate.

/ / /

/ / /

88. About April 23, 2024, Lacaillade finally gave notice that he was resigning from Flexport. Nevertheless, Plaintiff believes and therefore alleges that Lacaillade continued his meetings with Zhao for Freightmate while accessing Flexport's secure systems.

89. On or about April 24, 2024, Lacaillade sent Ms. Wischoff two documents, "freightmate Pre-Seed Planning Update" and "freightmate Burn Rate" during Flexport business hours from his personal Google account. *See* NW_GP_II-Flexport_0000315.C and NW_GP_II-Flexport_0000319.C. While Lacaillade has not produced true and correct copies of these documents due to his deletion thereof, Plaintiff believes and therefore alleges that these documents showed that Lacaillade and Zhao had done a substantial amount of work in building functional elements of Freightmate's initial MVP product.

90. On or about April 25, 2024, Ms. Wischoff sent Zhao and Lacaillade a Simple Agreement for Future Equity (SAFE) for a substantial cash investment in exchange for a future right to equity in Freightmate. *See* Zhao00062682.

91. Plaintiff believes and therefore alleges that on or about April 26, 2024, Lacaillade and Zhao virtually met with Nicole Wischoff during Flexport business hours where they discussed the offer and next steps. *See* Zhao00062737, Zhao00062682. After further negotiations, Zhao and Lacaillade reached an agreement in principle with Ms. Wischoff for an initial $650,000 pre-seed investment in Freightmate, which would be formally executed once Lacaillade departed Flexport and incorporated Freightmate. *See* FREIGHT174428. At no time before departing Flexport did either Lacaillade or Zhao inform Flexport of this investment.

92. Plaintiff believes and therefore alleges that, on April 29, 2024, Lacaillade engaged counsel to prepare the necessary papers to incorporate Freightmate in Delaware. On May 3, 2024, Lacaillade set up a registered agent for Freightmate. *See* LACAILLADE0000718. Again, neither Lacaillade nor Zhao reported this to Flexport.

93. In the second half of April, Plaintiff believes and therefore alleges that Lacaillade and Zhao also scheduled at least seven one-on-one meetings, on April 16, April 17, April 22 (two meetings), April 23, April 25, and April 29, 2024. Plaintiff believes and therefore alleges that, during an April 17, 2024, meeting between 9:45 and 11 am Pacific Time, Lacaillade and Zhao

secretly accessed and downloaded (acting through Zhao) additional confidential Flexport files, including “West Dispatch Desk/TC Planning – US,” which contains a compilation of non-public shipment data.

94. Plaintiff believes and therefore alleges that Lacaillade continued scheduling long, solo meetings with Zhao while accessing Flexport’s secure systems and confidential files right until his departure on May 10, 2024. Plaintiff believes and therefore alleges that Lacaillade planned at least five meetings with Zhao using Flexport systems in May 2024, on May 1, May 3, May 6, and two meetings on May 8.

95. For example, Plaintiff believes and therefore alleges that Lacaillade scheduled a meeting with Zhao on May 1, 2024, from 9:15 am to 12 noon Pacific Time. During that meeting, Plaintiff believes and therefore alleges that Lacaillade and Zhao accessed and downloaded (acting through Zhao) multiple Flexport confidential and trade secret documents, including “PRD: FFApp Schedule Violation Work Items,” “[New Version] Send Flexport Arrival Notice WI Automation Requirements,” “Demurrage & Detention Visibility,” “West Dispatch Desk/TC Planning – US,” “Air Work Items for Squads,” and “Ops Summit - On Time Performance and Schedules.”

96. As another example, Plaintiff believes and therefore alleges that Lacaillade and Zhao scheduled a meeting on May 3, 2024, from 10:30 to 11:00 am Pacific Time. For hours before this meeting, Plaintiff believes and therefore alleges that Zhao downloaded volumes of Flexport trade secret documents and presentations, including copies of the “FFApp Export User Manual,” copies of “Forwarding App All Hands” presentations covering multiple years, copies of “All Hands” presentations, videos, and notes from multiple other parts of the Flexport business, “PM Recruitment Training – All Hands,” multiple copies and versions of Flexport User Guides and Product Guides, the “Client App PoC Product Spec,” “FFA Subject Matter Experts (SME) Onboarding Plan,” “FF App Latency (Network Infra) Improvement Proposal,” and many other documents. Shortly before the meeting, Plaintiff believes and therefore alleges that Zhao copied Flexport confidential and trade secret information into a Google Docs file named “[New Version] Send Flexport Arrival Notice WI Automation Requirements,” which Zhao copied from his Flexport work account on Google Docs onto his Freightmate device around May 13, 2024.

97. Likewise, on May 6, 2025, Plaintiff believes and therefore alleges that Lacaillade scheduled a meeting with Zhao for 9 to 10 am Pacific Time. During that meeting, Plaintiff believes and therefore alleges that Lacaillade and Zhao downloaded (acting through Zhao) the confidential Flexport document "[Final] Flexport Forwarding Application (FFA) - October 2023 MBR" and viewed "FFA 2023 Release Planning / IQP." Then, shortly after the scheduled meeting, Plaintiff believes and therefore alleges that Lacaillade emailed without authorization a confidential Flexport "Doc Writing Checklist" to his personal Gmail address. Over the remainder of the day, Plaintiff believes and therefore alleges that Zhao downloaded scores of documents containing Flexport trade secrets, such as Flexport logs, data, trackers, models, training material including about twenty "MANDATORY TRAINING" documents, a "BOL Training" presentation, training recordings, operating procedure documents, instructions, handbooks, and other materials.

98. On May 7, 2024, Plaintiff believes and therefore alleges that Lacaillade created a Google Workspace, created email accounts for the three founders, and set up a Slack communications channel for Freightmate.ai. *See* FREIGHT007761, FREIGHT005656. On that same day, Plaintiff believes and therefore alleges that Lacaillade added his co-founder Zhao to the Slack channel. Also on this day, Plaintiff believes and therefore alleges that Zhao looked through Flexport's secure folders and downloaded without authorization over three dozen confidential files containing Flexport's standard operating procedures.

99. Despite still being employed by Flexport, Zhao and Lacaillade began conducting Freightmate business using their Freightmate emails accounts as early as May 8, 2024. *See* Zhao00062624, FREIGHT007759. This included actively searching for contractors using a third-party service. *See* Zhao00062607, FREIGHT007760.

100. Plaintiff believes and therefore alleges that, on May 8, 2024, Lacaillade scheduled two meetings with Zhao using Flexport systems, first from 8:30 to 10:30 am Pacific Time and another from 11:00 to 11:45 am. Plaintiff believes and therefore alleges that, during the first meeting, the Freightmate co-founders (acting through Zhao) accessed and downloaded without authorization trade secret and confidential Flexport files, such as "West Dispatch Desk/TC Planning – US," "Notes - Weekly FFA Import LCL UAT & Launch Check-in," and "Client

Obsession - ���Know Your Client���." Further, Plaintiff believes and therefore alleges that, at approximately 11:48 am (*i.e.*, immediately after the second meeting or during that meeting, if it ran a few minutes over), the Freightmate co-founders (acting through Zhao) accessed and downloaded without authorization a confidential Flexport file called "FFA Integrated Monthly Demo."

101. Plaintiff believes and therefore alleges that, on May 9, 2024, Zhao downloaded without authorization around 2,000 confidential Flexport documents from his Flexport Google drive, while deleting over 6,000 documents and trashing another almost 4,000. He downloaded volumes of documents regarding the Flexport Forwarding App, including notes on work items, work flows, meeting notes, working models, design overviews, plans and roadmaps, deep dive workshop notes, and thousands more. The downloaded documents included Flexport trade secret information, including at least over 60 project plans, more than a dozen Flexport project roadmaps, and a document on the Flexport "BOL Engine."

102. On May 9, 2024, Plaintiff believes and therefore alleges that Lacaillade immediately provided Zhao with access to Freightmate's Google drive so that he could directly upload Flexport's confidential and proprietary information for Freightmate's use. *See* FREIGHT007758.

103. In early May 2024, Lacaillade and Zhao also continued to divert their attention to Freightmate. For example, they used Lacaillade's Figma account to design Freightmate's website and appears to have worked on the user interface for the "freightmate Ai Portal." *See* Zhao00062735; Zhao00062670; FREIGHT003086.

104. Friday, May 10, 2024, was officially Lacaillade's last day at Flexport. On the following business day, Monday, May 13, 2024, Plaintiff believes and therefore alleges that Lacaillade and Zhao formally launched Freightmate, with Lacaillade filing incorporation papers on behalf of the Defendants. *See* FREIGHT000857-1411.

105. On May 13 and 14, 2024, Zhao downloaded thousands of Flexport's confidential and trade secret Flex ID shipping documents from Flexport's FAA repository and uploaded them to Freightmate's Google drive without Flexport's knowledge or authorization for the benefit of Defendants.

106. Plaintiff believes and therefore alleges that, while Zhao was acting on behalf of and for Freightmate's benefit as Freightmate's agent at least since January 2024, he formally became a Freightmate shareholder, board member, and officer no later than May 15, 2024. *See, e.g.*, FREIGHT002639; Zhao00062613; NW_GP_II-Flexport_0000134 at 186. Plaintiff believes and therefore alleges that, after May 15, 2024, Zhao continued acting on behalf of and for Freightmate's benefit as its agent despite still being an employee of Flexport.

107. Plaintiff believes and therefore alleges that, on May 15 and 16, 2024, Zhao downloaded more than a dozen additional Flexport trade secret documents laying out its standard operating procedures and project plans.

108. Zhao continued to divert his attention to Freightmate work during Flexport business. Hours. For example, on May 14, 2024, Lacaillade and Zhao worked on "freightmate Discovery Interviews" in furtherance of Freightmate's business. *See* FREIGHT005653.

109. On May 21, 2024, Zhao sent more than a dozen emails from his Flexport email account to his personal email account, forwarding and attaching a set of around 30 Flexport shipping documents containing Flexport Platform Trade Secrets, including Arrival Notices, Waybills, Manifests, Delivery Orders, Pickup Requests, Invoices, and Shipment Notifications, among others. Plaintiff believes and therefore alleges that in early June, Zhao sent some or all of these from his personal email to tech@freightmate.ai, an email account shared by multiple Freightmate workers. While the exact details are presently unknown, Plaintiff believes and therefore alleges that at least some stolen confidential shipping documents were accessed, used, and disclosed by each Defendant.

110. Plaintiff believes and therefore alleges that, on May 28, 2024, Zhao messaged a Flexport co-worker about his role as a founder of Freightmate. Zhao stated that he and Lacaillade "are co-founders, and [Lacaillade] quit a bit earlier to start the incorporation." Zhao invited the co-worker to consider joining Freightmate, stating "try our startup, and find another job if the startup didn't goes [sic] well 😊".

/ / /

/ / /

111. Plaintiff believes and therefore alleges that, although Freightmate had already been doing business in Washington, Freightmate reported to the State of Washington that it had commenced business in the State on May 29, 2024, with Zhao as a "governor" of the corporation.

112. On May 30, 2024, Plaintiff believes and therefore alleges that Zhao downloaded the Copyrighted Flexport Platform Source Code ("flexport-master.zip") onto his USB drive. Flexport believes and therefore alleges that the ZIP file contained a "master" repository of Flexport's GitHub workspaces, i.e., source code, as of early 2024. Flexport believes and therefore alleges that this source code related to all then-existing features of the Flexport Platform.

113. Also on May 30, 2024, Plaintiff believes and therefore alleges that Zhao downloaded more than 51,000 additional documents, many containing Flexport trade secrets and confidential information, including at least over 200 project plan documents, a dozen roadmaps, over 1100 documents relating to Flexport standard operating procedures and the application of them, over a dozen handbooks, and many Flexport Freight Dataset materials such as delivery orders and bills of lading. Plaintiff believes and therefore alleges that Zhao transferred this information onto his external Freightmate device, and also transferred portions of it containing Flexport Freight Dataset trade secrets to the Freightmate Google Drive account for Defendants' benefit.

114. On May 30, 2024, Plaintiff believes and therefore alleges that Zhao also sent another half-dozen emails from his Flexport email account to his personal email account, forwarding and attaching another set of documents comprising Flexport Freight Dataset trade secrets, including at least Booking Receipt Notices, Waybills, and a Booking Confirmation, among others. Plaintiff believes and therefore alleges that in early June, Zhao sent some or all of these from his personal email to tech@freightmate.ai.

115. In May 2024, Plaintiff believes and therefore alleges that Zhao also uploaded stolen Flexport documents from his personal USB drive (which stored, for example, the stolen Flexport Platform Source Code) to the Freightmate Google Drive System.

116. June 4, 2024, was Zhao's last day at Flexport. He marked the day by downloading numerous additional Flexport Platform Trade Secret and other documents from Flexport's secure systems, including "Work Item Automation Deep Dive," "Import FFA Partner WIs," "[New

Version] Send Flexport Arrival Notice WI Automation Requirements," "FFA Import Work Items (EMEA Requirement Collection)," and others. He also emailed to his personal email a confidential June 4, 2024, Bi-Weekly Report detailing Flexport's internal goals and status relating to data integrity.

117. In June 2024, Plaintiff believes and therefore alleges that Zhao transferred additional stolen documents from his personal USB drive to his personal Google Drive and to the Freightmate Google Drive. All told, Zhao uploaded thousands of stolen confidential Flexport documents (including folders of data) to the Freightmate Google Drive, which Plaintiff believes and therefore alleges included Flexport Freight Datasets trade secrets. Plaintiff believes and therefore alleges that multiple Freightmate employees were allowed to and did access these documents, sharing the documents with others and making additional copies onto their Freightmate laptops.

118. Plaintiff believes and therefore alleges that Lacaillade was aware that Zhao had taken and was using Flexport trade secrets. For example, Lacaillade acquiesced and personally participated in using the Flexport Freight Datasets trade secrets for development of Freightmate products. For example, Plaintiff believes and therefore alleges that Freightmate employees circulated documents comprising the Flexport Freight Datasets trade secrets to the shared tech@freightmate.ai email account as well as to Lacaillade's Freightmate email address. Although Lacaillade had promised to report misuse of Flexport confidential information, he failed to notify Flexport or, Plaintiff believes and therefore alleges, cause Freightmate to take any action against its employee Zhao. Instead, Plaintiff believes and therefore alleges that Lacaillade received and retained stolen confidential files at least until Freightmate announced the launch of its initial product. Indeed, in mid-June 2024, Plaintiff believes and therefore alleges that Lacaillade downloaded a number of stolen Flexport shipping documents from the Freightmate Google Drive to the laptop he used for Freightmate business and ran documents reflecting Flexport Freight Datasets trade secrets, such as Master Bills of Lading (MBL) and Arrival Notes (AN)) through ChatGPT. Plaintiff believes and therefore alleges that Lacaillade was not the only Freightmate employee that performed such actions.

/ / /

119. Plaintiff believes and therefore alleges that Freightmate launched its prototype "Docmate" product less than three weeks later, around June 27, 2024. At this time, Defendants exited "stealth mode" and announced the release of Freightmate's "first automated solution."[1] Mirroring Flexport's core business proposition, Defendants' investor stated that Defendants would develop "a next-gen-AI-powered freight management system" because "[f]reight forwarders coordinate global shipments from end to end from origin country to destination country, leveraging decades-old software with zero task automation, no real-time communication, with a very limited UX." Plaintiff believes and therefore alleges that Freightmate competes with Flexport.

120. On July 1, 2024, Plaintiff believes and therefore alleges that Freightmate employees, including Lacaillade and Zhao, deleted evidence relating to their possession and use of confidential Flexport documents. Plaintiff believes and therefore alleges that Defendants' destruction of evidence after launching their product indicates that each Defendant was aware of their misconduct.

121. On or about September 6, 2024, Flexport sent letters to Lacaillade and Zhao concerning their violations of Flexport's intellectual property rights and breaches of their contractual obligations concerning confidentiality and intellectual property owed to Flexport.

122. Plaintiff believes and therefore alleges that Lacaillade deleted additional Flexport freight documents from his laptop on September 6, 2024.

123. Also in September 2024, Plaintiff believes and therefore alleges that Lacaillade deleted some, but not all, of a set of digital photographs he had taken of confidential Flexport information. Plaintiff believes and therefore alleges that while Lacaillade and Zhao deleted some Flexport confidential documents that were in their possession, they each continue to possess at least some confidential Flexport files taken without authorization from Flexport's secure systems.

124. All told, Plaintiff believes and therefore alleges that Defendants (acting through Zhao) saved to Freightmate storage without authorization over 70,000 confidential Flexport documents. Indeed, Flexport's investigations to date show that, just between May 13, 2024, and Zhao's departure from Flexport on June 4, 2024, Zhao copied without authorization at least about

---

[1] *See* Sharkey, G., "Freightmate Ai exits stealth mode with pre-seed funding and new tech" (Jun. 27, 2024), Freight Waves, available online at https://www.freightwaves.com/news/freightmate-ai-exits-stealth-mode-with-pre-seed-funding-and-new-tech (last visited on March 11, 2025).

60,000 files from Flexport's secure repositories, including Flexport's trade secrets, copyrighted source code, and confidential information.

125. Plaintiff believes and therefore alleges that Zhao and Lacaillade, as co-founders and principals of Defendant Freightmate, were acting in concert in furtherance of their intentions to compete unfairly with Flexport using stolen Flexport intellectual property.

**F. Defendants admit to stealing, disclosing, and using Flexport's trade secrets.**

126. In or about September 2024, after learning of Freightmate and its objective of developing AI-powered freight management systems, Flexport was shocked to discover that Defendant Zhao had taken thousands of Flexport documents in the weeks and months leading up to his departure.

127. Promptly thereafter, on September 6, 2024, Flexport sent the aforementioned legal notice to Zhao and Lacaillade seeking their cooperation in assessing the scope of their data theft and in recovering Flexport's data.

128. In a response dated November 1, 2024, Defendants did not dispute that Zhao downloaded Flexport documents prior to his departure from Flexport. However, Defendants contested that any Flexport source code was exfiltrated and refused to allow any review of Freightmate's source code.

129. In a letter dated December 19, 2024, Defendants provided a further response to Flexport's legal notice. This response stated that Lacaillade and Zhao together incorporated Freightmate on May 13, 2024. The response admitted that Defendants did not start building a prototype of Freightmate's product until June 7, 2024, and yet, as noted above, Defendants launched Freightmate's initial product just three weeks later, on or about June 27, 2024, an incredible feat that Flexport believes and therefore alleges would not have been possible without the benefit and use of Flexport intellectual property. Defendants further admitted that, before developing Freightmate's products, they secretly ran confidential Flexport documents "through ChatGPT to better understand how generative AI digitizes analog shipping documents." Defendants had no authorization to use Flexport's proprietary information for their own benefit or to disclose it to third parties in this manner.

130. In its December 19, 2024, letter, Defendants further admitted that their forensic expert found over 9,000 Flexport documents in Defendants' possession. They admitted that Zhao took without permission at least the following confidential Flexport files: "Final Flexport RFP H2.xlsx," "Rates for Flexport.xlsx," "FFA Automation Demo.mp4," and "ffapp_model applicable_work_items 2024-03-11T1152.csv." Defendants also admitted that Zhao retained "a complete backup" of his Flexport laptop, but claimed that Zhao retained Flexport's intellectual property "passively and inadvertently." Plaintiff believes and therefore alleges that this claim is false, and Zhao intentionally and knowingly took this information without permission for Defendants' benefit and use, while taking steps to conceal his exfiltration of Flexport trade secrets.

131. Between January and February 2025, Flexport investigated Defendants' conduct and response. Flexport determined that, just days before his departure, on May 30, 2024, Zhao downloaded the Copyrighted Flexport Platform Source Code ("flexport-master.zip") onto his USB drive. Flexport believes and therefore alleges that Zhao obtained this massive file of critical Flexport source code using his Flexport work account on GitHub, which is the primary tool Flexport software programmers use to collaborate and write source code. Flexport believes and therefore alleges that the ZIP file contained a "master" repository of Flexport's GitHub workspaces, i.e., source code, as of early 2024. Flexport believes and therefore alleges that this source code related to all then-existing features of the Flexport Platform.

132. Flexport also determined that, besides the Copyrighted Flexport Platform Source Code, Defendants had also misappropriated Flexport Platform Trade Secrets (including Flexport Freight Datasets for Training Automated Freight Management Tools), and Flexport Business and Operational Trade Secrets.

133. For example, Flexport believes and therefore alleges that Zhao took in furtherance of Defendants' conspiracy and for Defendants' benefit Flexport Platform Trade Secrets contained in multiple files, including those titled "Work Item Automation Deep Dive," "Import FFA Partner WIs," "FFApp Instrumentation Validation MVP," "FF App Roadmap," "FFA Import Work Items," "[New Version] Send Flexport Arrival Notice WI Automation Requirements.pdf," and "CU-ISF V2 Core Integration Runbook-130524-185733.pdf." Likewise, Flexport believes and therefore

alleges that Zhao took in furtherance of Defendants' conspiracy and for Defendants' benefit Flexport Freight Datasets trade secrets contained in multiple files, including at least the ~2,000 "shipping documents" that Freightmate found in the storage locations Zhao used for Freightmate business, a subset of which Lacaillade downloaded for use in Freightmate product development. Flexport believes and therefore alleges that Defendants conspired to take and took these materials to help develop a freight management system that competes with the Flexport Platform. For example, in January 2025, Defendants announced close of a seed funding round, reiterating that, "[w]hile freightmate currently focuses on automating specific workflows," its goal is to build an "automated Freight Management System (FMS), powered by AI" to "unlock zero-touch shipments."

134. For example, Flexport believes and therefore alleges that Zhao took in furtherance of Defendants' conspiracy and for Defendants' benefit Flexport Business and Operational Trade Secrets contained in multiple files, including those titled "air-freight-scrapers-130524-185844.pdf," "BOL Training.pptx," "China Legal Framework and Practice for Export of Medical Devices.pdf," "Dangerous Goods Training Manual (CBTA)," "Flexport competition law compliance training.pdf," "Shipment Operations MBR Metrics," "New Brand Deck Assets," "Flexport_Brand_Guidelines_February_2024.pdf," and "Quality, On-Brand Messaging." Flexport believes and therefore alleges that Defendants conspired to take and took these materials to avoid the costs involved in researching and developing expertise and experience in navigating the complex global logistics ecosystem, to freeride off Flexport's years of developing and refining strategies for expanding and promoting its business, and to train its current and anticipated AI-related product and service offerings, including its document ingestion tool called "Docmate."

135. Flexport believes and therefore alleges that Defendants have used, and continue to use, Flexport's trade secrets, copyrighted source code, and confidential information, as is apparent from Freightmate's ability to rapidly serve Flexport's competitors and customers. For example, in or about January 2025, Freightmate noted that it is "partnering with over three times the number of freight forwarders that [it] anticipated by this time." Flexport believes and therefore alleges that this would not have been possible without Defendants' improper access, copying, disclosure, and

use of Flexport's intellectual property.

136. Flexport has suffered, and continues to suffer, damages because of Defendants' conduct. For example, Flexport believes and therefore alleges that Defendants are already selling, and intending to sell, Freightmate's derivative products and services to Flexport's actual and potential customers, to compete unfairly with Flexport.

137. Flexport is being irreparably harmed due to Defendants' continuing wrongdoing. For example, Flexport believes and therefore alleges that its trade secrets remain in the hands of Defendants, who should never have possessed those trade secrets in the first place, and Zhao, who has already engaged in egregious and dishonest conduct involving these valuable assets of Flexport. Flexport believes and therefore alleges that Defendants continue to exploit Flexport's intellectual property, while Flexport is deprived its right to exclusive enjoyment of its property. Furthermore, Flexport believes and therefore alleges that Flexport's confidential information remains subject to potential exposure or misuse by persons whom Flexport cannot control. This places Flexport in an untenable position through no fault of Flexport.

138. Therefore, Flexport seeks legal and equitable relief, including damages and restitution, as well as a preliminary and a permanent injunction.

## COUNT I

**TRADE SECRET MISAPPROPRIATION**
**The Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b), 1839 et seq.,**
**The California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq.**
**(Against All Defendants)**

139. Flexport re-alleges and incorporates by reference the allegations above as though fully set forth herein.

140. Flexport owns trade secrets. In particular, as detailed above, Flexport is the owner of the Copyrighted Flexport Platform Source Code, Flexport Platform Trade Secrets, Flexport Freight Datasets for Training Automated Freight Management Tools, and Flexport Business and Operational Trade Secrets. Flexport has invested significant time and money developing this intellectual property, which is of substantial economic value due to its nonpublic nature and provides Flexport a competitive advantage. At all times relevant, Flexport took reasonable

measures, as detailed above, to protect the secrecy of the trade secrets at issue.

141. Flexport's trade secrets relate to products or services used in and intended for use in interstate commerce. For example, the Flexport Platform is used, sold, purchased, or transported, or intended for use, sale, purchase, or transport, across the United States and throughout the world, including this District. Flexport uses the trade secrets Defendants misappropriated to cater to its customers worldwide, who engage in international trade and/or interstate trade within the United States. Furthermore, the trade secrets were stolen across state lines, from San Francisco-headquartered Flexport by Washington-based Defendants.

142. Flexport believes and therefore alleges that Defendants misappropriated Flexport's trade secrets. Flexport afforded Zhao and Lacaillade access to Flexport's trade secret information only on the condition that they recognize and protect the information as Flexport's trade secrets. Flexport believes and therefore alleges that Defendants acted in concert to, without permission and in contravention of Zhao's and Lacaillade's contractual obligations toward Flexport, acquire, access, disclose, and use Flexport's trade secrets for their own benefit. Flexport believes and therefore alleges that Defendants misappropriated Flexport's trade secrets by possessing and using the trade secrets knowing them to be stolen, and refusing to return them to Flexport. Flexport believes and therefore alleges that, since acquiring Flexport's trade secrets, Defendants have used and disclosed those trade secrets, including to influence the development and release of products that compete with Flexport's offerings.

143. Flexport believes and therefore alleges that Defendants knew or had reason to know at the time they acquired, accessed, disclosed and used Flexport trade secrets that this information is confidential and was acquired and maintained by improper means and under circumstances giving rise to a duty to maintain secrecy or limit use, including by virtue of the Agreement, Policy, Handbook, and Code. Flexport believes and therefore alleges that Defendants further knew or had reason to know that this information was developed or acquired by Flexport at great expense and effort. Flexport believes and therefore alleges that Defendants further knew or had reason to know that Flexport maintains this information as confidential, that the information is not generally available to the public or to Flexport's competitors, and that the information would provide

significant benefit to anyone seeking to compete with Flexport.

144. Flexport believes and therefore alleges that Flexport and Freightmate are competitors in the logistics and freight management industries. Flexport believes and therefore alleges that Defendants have developed and are developing for sale products and services that compete with Flexport's offerings like the Flexport Platform and the suite of features the platform offers Flexport customers. Flexport believes and therefore alleges that Defendants' products and services, derived wrongfully from Flexport's trade secrets, undermine the competitive advantage that the Flexport Platform offers Flexport.

145. Flexport believes and therefore alleges that Defendants acted in concert and as joint tortfeasors to wrongfully access, copy, disclose, and use Flexport's trade secrets. Furthermore, Flexport believes and therefore alleges that Zhao is an agent of Freightmate and acted within the scope of his employment with Freightmate in dishonestly acquiring, disclosing, and using Flexport's trade secret information to benefit Freightmate. Freightmate is therefore vicariously liable for Zhao's misappropriation of Flexport's trade secrets, in addition to being directly liable for its own improper acquisition, use, and disclosure of Flexport's trade secrets as alleged herein.

146. Flexport believes and therefore alleges that Freightmate is liable for torts committed by Lacaillade, Zhao, and any other predecessor(s)-in-interest of Freightmate prior to May 13, 2024, under principles of successor liability at least because Freightmate was a mere continuation of such predecessors.

147. At no time did Flexport consent to Defendants' improper acquisition, disclosure, or use of Flexport's trade secrets.

148. Thus, Defendants have engaged in the actual and threatened misappropriation of Flexport's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b), 1839 et seq., and the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq.

149. Flexport believes and therefore alleges that Defendants continue to possess and use Flexport's trade secrets to compete with Flexport.

150. Defendants' misappropriation has directly and proximately caused damage to Flexport, including but not limited to loss of profits, loss of goodwill, damage to its reputation, and

damage to its competitive advantage and business opportunities—for which Flexport is seeking compensation.

151. Defendants have been unjustly enriched as a further proximate result of their misappropriation of Flexport's trade secrets—for which Flexport also is seeking compensation.

152. Flexport is entitled to compensatory damages and disgorgement of any and all profits Defendants made as a result of their wrongful conduct, in amounts to be proven at trial.

153. Flexport believes and therefore alleges that Defendants' actions in misappropriating Flexport's trade secret were willful, fraudulent, malicious, and were done with the intent to injure and oppress Flexport and improve Defendants' own economic opportunities, thereby justifying an award of punitive damages against Defendant pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

154. Defendants' actions have caused and will continue to cause Flexport irreparable harm if not preliminarily and permanently enjoined. Flexport has no adequate remedy at law. Flexport is thus entitled to injunctive relief to protect its confidential information and trade secrets by 1) enjoining Defendants from further possessing, using or disclosing Flexport's trade secret; 2) enjoining Defendants from altering or deleting Flexport's trade secrets before returning them; and 3) requiring Defendants to turn over to Flexport any and all copies of Flexport's trade secret, including any products or information derived therefrom.

## **COUNT II**

### **BREACH OF CONTRACT**
### **(Against Defendants Zhao and Lacaillade)**

155. Flexport incorporates and re-alleges every allegation above as if fully set forth herein.

156. Flexport had a valid contract with each of Zhao and Lacaillade. For example, Zhao and Lacaillade voluntarily accepted each of the Agreement, Policy, Handbook, and Code. Flexport fulfilled its obligations toward each employee under the parties' contracts.

157. Flexport believes and therefore alleges that Zhao and Lacaillade materially breached and continue to be in breach of their respective obligations toward Flexport. For example, Zhao

and Lacaillade each breached their representation to Flexport that they have "not made, and agree not to make, any agreement, oral or written, that is in conflict with [the] Agreement or [their] employment with the Company." By concealing their intention to form, and their actions toward forming, a business to compete with Flexport, Zhao and Lacaillade wrongfully deprived Flexport any opportunity to revoke or limit Zhao's and Lacaillade's access to Flexport intellectual property. Flexport believes and therefore alleges that Zhao and Lacaillade intentionally breached their contractual and fiduciary obligations in furtherance of their conspiracy to exfiltrate Flexport trade secrets for the benefit of Defendants.

158. Furthermore, Flexport believes and therefore alleges that, acting in concert, Zhao and Lacaillade breached their obligations under the Agreement to "hold in strict confidence and not directly or indirectly disclose or use any Proprietary Information, except as required within the scope of [their] employment." They similarly breached their assignment to Flexport of "all right, title and interest in and to all Inventions (including all Intellectual Property Rights therein, related thereto or embodied therein) that are collected, made, conceived, developed, reduced to practice or set out in any tangible medium of expression or otherwise created, in whole or in part" using Flexport proprietary information. They further breached their promise to, "[u]pon termination of [their] employment," "promptly identify and, as directed by [Flexport], destroy, delete or return to [Flexport] all items containing or embodying [its] Proprietary Information (including all original or copies of content, whether in electronic or hard-copy form)[.]"

159. Furthermore, Zhao and Lacaillade breached (and continue to be in breach of) their duty under the Policy to use "information systems . . . only . . . for business objectives that serve the interests of Flexport and their customers." They further breached their agreement to treat as "the sole property of Flexport," "Flexport proprietary information stored on electronic and computing devices whether owned or leased by Flexport, [Zhao or Lacaillade] or a third party."

160. In similar respects, Zhao and Lacaillade also breached their obligations toward Flexport under the Handbook and the Code.

161. Likewise, Zhao and Lacaillade breached, and continue to breach, their obligation under the Policy to "report the theft, loss or unauthorized disclosure of Flexport proprietary

information." For example, by falsely asserting that Defendants "inadvertently" retained Flexport's proprietary information, Defendants disregard this obligation of Zhao and Lacaillade to assist Flexport in assessing the extent of Defendants' misuse of the information.

162. As a proximate result of Zhao's and Lacaillade's actions, Flexport has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law. For example, Flexport has been deprived the exclusive enjoyment of its valuable intellectual property, while Defendants exploit Flexport proprietary information to unfairly compete with Flexport.

163. Flexport believes and therefore alleges that Zhao and Lacaillade have no justification for these actions.

164. Flexport is entitled to damages, permanent injunctive relief against further breaches of the contractual obligations identified above, including the return to Flexport of all Flexport proprietary information as well as any derivative information or products.:"

## COUNT III

## BREACH OF FIDUCIARY DUTY
## (Against Defendants Zhao and Lacaillade)

165. Flexport incorporates and re-alleges the allegations in Paragraphs 1 through 149 and paragraphs 166 through 175 above as if fully set forth herein.

166. As an original member of the Flexport team tasked with developing FFA and its automation tools, Zhao owed a fiduciary duty to Flexport in his role as Principal Technical Program Manager.

167. As an original member of the Flexport team tasked with developing FFA and its automation tools, Lacaillade owed a fiduciary duty to Flexport in his role as Group Product Manager (October 18, 2021 to April 1, 2024) and later Director, Product Manager (April 1, 2024 to May 10, 2024).

168. Through their employment with Flexport, and by their separate roles, Zhao and Lacaillade indisputably owed a duty of loyalty and care to Flexport. Through their conduct, Zhao and Lacaillade acted in their own interests, self-dealing, and in direct conflict with, and counter to, Flexport's interests.

169. Zhao and Lacaillade, both together and separately, breached their duties by secretly conspiring to and then forming a company to compete with Flexport. Zhao and Lacaillade undertook these acts during Flexport business hours, frequently communicating and meeting about Freightmate business while on the clock at Flexport and while using Flexport's systems and resources. As detailed above, Zhao and Lacaillade even went as far as to deceive their subordinates and fellow employees at Flexport by seeking input on "current day-to-day realities, behaviors, and pain points," and opportunities with respect to data structure, data management, and automation under the false pretense they were doing so for the benefit of Flexport when in reality they were doing it for their own personal gain and advantage in starting Freightmate.

170. While still employed by Flexport, Zhao and Lacaillade used Flexport's resources to develop intellectual property that was within Flexport's line of business and failed to disclose and assign that such intellectual property to Flexport as required. Rather than disclose such developments to Flexport, Zhao and Lacaillade diverted that intellectual property for their own use and personal financial gain by using to form a competing company, Freightmate. Lacaillade admitted as much early on when he represented to a third party in a text message that he was "[l]ooking to potentially start something with 2 of my co-workers that I joined Flexport with …. [b]asically building the same tech we are building for Flexport as a SaaS for other freight forwarders." *See* LACAILLADE0000315. Thus, acting in direct conflict with Flexport's best interests and their duty of loyalty owed to Flexport.

171. Given their positions at Flexport, as original members of the team developing FFA and its automation tools, Zhao and Lacaillade, together and separately, understood and appreciated the nature of Flexport's business and its products and services and the contractual and fiduciary duties they owed to Flexport. This is further evidenced by the fact that, beginning at least as early as October 2023, Zhao and Lacaillade frequently discussed their obligations under Flexport's Employee Inventions & Proprietary Information Agreement in the $100BN Company Founder WeChat group and, Plaintiff believes, at in person meetings referred to in the WeChat group. On December 13, 2023, Lacaillade went so far as to instruct the group members to "download our offer letters so we can compare the wording in person. From there we can leverage legal guidance to

ensure we prevent getting sued…" *See* Zhao00062898. Similar discussions were continued and repeated in the #100bn-startup Slack chat. Lacaillade and Zhao were fully aware of their contractual and fiduciary obligations owed to Flexport. Accordingly, Zhao's and Lacaillade's breaches were intentional, willful and malicious.

172. Lacaillade, in particular, in his role as Director, Product Manager—a promotion he received and accepted during his secret conspiracy with Zhao—without question understood and appreciated the nature and value of the intellectual property he and Zhao created using Flexport's resources for their own benefit. Accordingly, Lacaillade's breach of fiduciary duty was, in particular, willful and malicious.

173. As a direct and proximate result of Zhao and Lacaillade's breaches of these duties owed to Plaintiff, Plaintiff has suffered damages in an amount to be proven at trial, which have accrued and are continuing to accrue.

174. As a further direct and proximate result of the acts of Zhao and Lacaillade, acts undertaken together and separately, Flexport has suffered, and will continue to suffer, irreparable harm; while Defendants have been unjustly enriched and continue to benefit from an unfair advantage gained through Zhao's and Lacaillade's breaches.

175. As Zhao and Lacaillade willfully and maliciously breached their duties, Flexport seeks recovery of its reasonable attorneys' fees and costs.

## JURY DEMAND

176. Pursuant to Civ. L.R. 3-6 and Fed. R. Civ. P. 38, Flexport requests trial by jury for all causes of action, claims, or issues in this action that are so triable.

## PRAYER FOR RELIEF

WHEREFORE, Flexport prays for as follows:

A. For judgment in Flexport's favor on all causes of action alleged against Defendants;

B. Award Flexport damages in an amount to be determined at trial, including without limitation, Flexport's lost revenues and profits, and any unjust enrichment, restitution, disgorgement, contract damages, or reasonable royalty to the extent permitted under the law;

C. Award preliminary and permanent injunction against Defendants, 1) enjoining Defendants from possessing, using or disclosing Flexport's trade secrets; 2) enjoining Defendants from altering or deleting Flexport's trade secrets before returning them; and 3) requiring Defendants to turn over to Flexport any and all copies of Flexport's trade secret, including any products or information derived therefrom.

D. An injunction requiring Zhao and Lacaillade, and each of their agents, servants, employees, attorneys, successors and assigns, affiliates and all persons, firms, and corporations acting in concert with them, to return to Flexport all Flexport proprietary information in their possession, including any products or information derived therefrom, and to identify Defendants' disclosures or use of such information;

E. A "Head Start" injunction preventing Defendants from conducting any business or operations for the duration of time that it would have taken Defendants to independently develop DocMate and/or any similar Freightmate platform, product or service through proper means;

F. Imposition of a constructive trust over Freightmate and its assets, effectively transferring ownership, products and profits back to Flexport, based on Zhao and Lacaillade's taking advantage of a business opportunity that rightfully belonged to Flexport, without proper disclosure and consent from Flexport, and using that business opportunity to Freightmate, Zhao and Lacaillade's benefit and to Flexport's detriment;

G. As required pursuant to Flexport's Employee Inventions & Proprietary Information Agreement executed by Zhao and Lacaillade, a declaration that Defendants hold in constructive trust for Flexport any intellectual property developed using or derived from Flexport's intellectual property, and an injunction requiring Defendants to assign to Flexport all such intellectual property;

/ / /

H. Disgorgement and unjust enrichment from freightmate to the extent freightmate received any benefit from the access, use or disclosure of Flexport information at Flexport's expense, which would be unfair to retain;

I. Award Flexport compensatory, punitive, and exemplary damages in an amount to be determined at trial;

J. Award Flexport pre-judgment and post-judgment interest, attorneys' fees and costs, and other expenses incurred in this action; and

K. For such other and further relief as the Court may deem to be just and proper.

Dated: June 10, 2026

RESPECTFULLY SUBMITTED,

SPENCER FANE LLP

*/s/ Jeffrey M. Ratinoff*
John V. Picone III
Jeffrey M. Ratinoff
Jennifer S. Coleman
Jing H. Cherng
Attorneys for Plaintiff,
FLEXPORT, INC.