UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FLEXPORT, INC.,

Plaintiff,

v.

FREIGHTMATE AI, INC., et al.,

Defendants.

Case No. 25-cv-02500-RFL

**RULINGS ON PRETRIAL MATTERS**

Having reviewed the pretrial filings and considered the arguments made at the final pretrial conference, the Court orders as follows:

## I. FLEXPORT'S MOTIONS IN LIMINE

***Motion in Limine No. 1 to Exclude Evidence of Relative Size and Financial Condition***: Granted in part. There shall be no references in evidence, testimony, or argument to this being a "David and Goliath" dispute, an attempt by a larger company to bully a startup, or any similar commentary. That is not relevant to any claim, and even if it were, it would be more unfairly prejudicial than probative. The motion is otherwise denied, without prejudice to objecting during trial to specific evidence under Rules 402 or 403. There may be numerous instances in which Freightmate's size, stage of development, and available resources, as well as Flexport's success in exploiting its trade secrets, will be relevant to both liability and damages, so it is not workable to exclude all such references across the board.

***Motion in Limine No. 2 to Exclude Evidence of Flexport's Ill Will or Motive for Bringing Suit***: Granted in part, denied in part. There is no relevance to Flexport's motive to sue, and evidence bearing only on that issue is excluded. The motion is otherwise denied without prejudice. Evidence that higher-ups at Flexport bear animosity toward Freightmate could be highly relevant to witness bias and credibility for certain Flexport employees, such as

Li. However, in other instances, if the witness is testifying to undisputed facts or is no longer employed at Flexport, such evidence is likely more unfairly prejudicial than probative. It is impossible to assess the Rule 403 balancing in the abstract. The denial of this motion is without prejudice to Flexport asserting objections at trial to specific testimony involving specific witnesses.

***Motion in Limine No. 3 Regarding Evidence and Argument Relating to Withdrawn Copyright Claim***: Granted in part. There shall be no references to Flexport's voluntary withdrawal of its copyright claim, which is irrelevant, and evidence that pertains solely to the withdrawn copyright claim is excluded. The motion is otherwise denied. Evidence that relates to both the withdrawn copyright claim and the remaining live claims is properly at issue in the trial. To the extent that this evidence raises Rule 403 issues, it is again impossible to address this issue across the board without reference to the specific evidence at issue. The denial of this motion is without prejudice to Flexport asserting objections at trial to specific testimony involving specific witnesses.

***Motion in Limine No. 4 to Exclude Armstrong Opinions***: Granted in part and denied in part. First, Flexport contends that Armstrong's experiment must be excluded because of his use of an AI agent in the design, execution, and grading of the experiment. Armstrong used Chat GPT-4o (which corresponds to the model available to Freightmate in July 2024) to ingest a sample of the shipping documents at issue. He found that the GPT-4o was able to extract the documents without significant prompt engineering with more than 74% accuracy under strict measures and more than 85% accuracy using a "tiered" metric commonly used in the industry, which ignores differences like capitalization and formatting. Flexport argues that Armstrong's testimony should be excluded because he used a modern 2026 AI agent (Claude Sonnet 4.5) to tell GPT-4o to extract the shipping data. The AI agent provided the prompts and the 33-field schema to Chat GPT-4o for the data extraction and then compared the extraction results to the original documents under various accuracy measures. Normally, the use of an electronic tool to perform menial tasks that can be independently verified after the fact would not render the

experiment that Armstrong created unreliable, any more than using a human assistant to perform those tasks would. Defendants' opposition to the motion in limine represented that Armstrong had produced "the corpus of shipping documents he ran, by Bates range; the extraction-schema fields; his verification rubric; model identifiers; ***verbatim extraction prompts***; and the complete extraction outputs (in native form)," such that "Flexport was free to re-run the experiment." (Dkt. No. 249-1 at 4 (emphasis added).)

At the final pretrial conference, however, Flexport pointed out that Armstrong had not in fact disclosed the prompts sent from the AI agent to Chat GPT-4o. That assertion is corroborated by the letters exchanged by the parties (Dkt. Nos. 254-6 and 254-7), and Defendants did not dispute the accuracy of this statement at the pretrial conference. Without that information, it is impossible to know what the AI agent told Chat GPT-4o to do, and thus what experiment was performed. Nor is it possible to "re-run the experiment" in any meaningful sense because a new version of the experiment might involve the AI agent sending a different set of prompts to Chat GPT-4o. For example, what if the AI agent provided an extensive and detailed set of prompts to Chat GPT-4o that allowed it to perform the extraction much more easily than it otherwise could have? The pre-digital equivalent would be Armstrong telling a human assistant to perform an experiment, without having any idea of steps the assistant actually performed in the experiment, and then proposing to submit the results to the jury. As the proponents of Armstrong's testimony, Defendants bear the burden to show that the testimony is reliable and helpful to the jury. Without this critical information about what the experiment involved, Defendants have failed that burden. The motion to exclude Armstrong's testimony as to the experiment is therefore granted.

The motion is otherwise denied. Flexport also seeks to exclude Armstrong's description of regulations governing shipping documents as a legal conclusion. To explain the format of shipping documents, Armstrong may testify about the industry standards, including how they are influenced by regulatory requirements, without providing a legal conclusion that is unhelpful to the jury. What the regulations actually require (as opposed to what the industry treats the

regulations as requiring) does not matter to the outcome of the case, and it is difficult to see how the jury could be confused about the topic, so it seems unnecessary to give a limiting instruction. However, if Flexport believes such an instruction would be helpful, it may propose one after meeting and conferring with Defendants and raise it in the morning at least one court day prior to Armstrong's testimony.

Also, contrary to Flexport's argument, Armstrong has sufficient expertise to testify about the use of AI to extract information from documents in the logistics context, for the reasons identified in Defendants' opposition.

***Motion in Limine No. 5 re Zeidman Opinions***: Granted in part and denied in part. Zeidman may not opine on what trade secret law is because it is not helpful to the jury, though he may opine on whether the information at issue is secret, readily ascertainable, and the like. This portion of the motion is otherwise denied.

Zeidman's opinion about the lack of any passages of literal and low-level non-literal copying is relevant to whether Defendants misappropriated Trade Secret No. 1 (Copyrighted Flexport Platform Source Code), because it bears on the likelihood that Defendants were looking at and relying on Flexport's code when they were creating Freightmate's product. This portion of the motion is denied. However, if Defendants dwell excessively on the lack of such copying, that may raise Rule 403 concerns, and the Court will entertain objections during trial on that basis.

Zeidman's opinion about how many Open AI tokens were consumed by requests has a sufficient foundation, because it relies upon the deposition testimony of Freightmate's CTO. That Zeidman also double-checked his conclusion with an undisclosed colleague is not relevant, so long as he does not rely on this double-check in his trial testimony. Moreover, in a rebuttal to Hotz's report, it was appropriate for Zeidman to assume that Hotz's numbers on total token usage were correct and then to explain why, even on that assumption, the token usage was consistent with Freightmate's story. This portion of the motion is denied.

Zeidman's cloud storage opinion was directly responsive to Hotz's opinion in his report

concerning the inferences to be drawn about a change to Freightmate's storage usage (at page 54) and is proper rebuttal. This portion of the motion is denied.

Zeidman's opinion on the four-week development timeline was also proper rebuttal to Hotz's opinion on the development timeline. Zeidman does not indicate an intent to testify that Freightmate independently developed its system, but only that the evidence is "consistent" with independent development, so there is no need to require a narrowing of his testimony. Zeidman's experience developing document storage and cloud-based enterprise software generally is sufficient for him to opine on how many lines of code can be written in a day, even if he has not worked in shipping or freight management. Whether the code repository snapshot he viewed provides the right baseline goes to the weight of his testimony rather than its admissibility. Nor does there appear to be a discovery problem as to the disclosure of the snapshot at issue, which his report states was "made available for Flexport's inspection on a secure review laptop in September 2025." The motion is granted, however, as to Zeidman's opinion that the Freightmate founders had "significant industry knowledge and tool experience." Zeidman lacks the industry experience to so opine and will be precluded from offering that opinion. This portion of the motion is otherwise denied.

## II. FREIGHTMATE AND LACAILLADE'S MOTIONS IN LIMINE

***Motion in Limine No. 1 to Exclude Kay Opinion re 95% Extraction Accuracy and Hotz's Opinion re 1250-2300 Hours Benchmark***: Denied. Kay's opinion on this topic is sufficiently reliable under Rule 702(c) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). Based on his experience and the information produced in discovery about Freightmate's process, he explains the steps (including labeling, prompts, and regression testing) necessary to use GPT-4o to develop a system to accurately extract data from documents, and compares his time estimates to a peer-reviewed business document extraction benchmark. That this opinion is based on experience with business document extraction generally, and not specifically extraction of shipping documents, goes to the weight rather than the admissibility of his testimony. Likewise, Kay was not required to run any experiments in general or specifically about how long

it took to improve prompt accuracy from 74-75% (which Freightmate's expert Armstrong describes as the baseline without any prompt iteration) to 95%. Though an experiment might be one way to form a reliable basis for an opinion, it is not the only way. Nor does Rule 403 provide a basis for excluding this opinion, as it has significant probative value on a hotly contested issue that will be outside the ordinary layperson's experience and, with the opportunity for cross-examination as to the deficiencies identified, is not unfairly prejudicial.

For similar reasons, Hotz's opinion concerning the hours benchmark is also sufficiently reliable under Rule 702(c) and *Kumho Tire*. Hotz's opinion walks through its assumptions as to the workstreams required and the hours for each based on his extensive experience in enterprise software involving supply-chain logistics and document processing. He also uses the implementation timeline from Primary Freight as a real-world benchmark. That is enough. Also, Rule 403 does not provide a basis to exclude Hotz's use of an hour range and dollar range (based on salary data), because that information is probative as to the value of the hours saved by the alleged misappropriation and Defendants' criticisms of its limitations can be addressed through cross-examination, avoiding unfair prejudice.

***Motion in Limine No. 2 to Exclude Kay's Opinion re Economic Value of Trade Secret No. 8 and Hotz's Opinion of Time Required to Develop Minimum Viable Product***: Denied. Kay's opinion is helpful to the jury on the important factual issue of the value of Trade Secret No. 8, and is more probative than unfairly prejudicial under Rule 403. Kay's opinion explains the value of the compilation of a dataset of this size across different document types and variations. Though his opinion would certainly be more persuasive if he had actually reviewed the particular subset constituting Trade Secret No. 8, his general testimony about why Flexport's curated sets of shipping documents are valuable is still important and helpful enough to support its admissibility. Though Defendants contend that the particular curated set on which Kay relies is too dissimilar from Trade Secret No. 8, there is sufficient evidence that the curated set is similar to the Flexport shipping document folders that Zhao allegedly downloaded, which principally constituted documents identified as Trade Secret No. 8. To the extent Defendants

dispute the level of similarity, cross-examination will be sufficient to educate the jury on the difference. The probative value of the opinion outweighs any unfair prejudice.

Likewise, Hotz's estimate of how long it would take to achieve an "MVP-level system" (*i.e.*, a "minimal viable product") is admissible under Rules 702 and 403. Lacaillade used that same term in describing the "first tool" developed by Freightmate in his deposition testimony at page 228 (Dkt. No. 245, Exhibit 10) and in a contemporaneous email (Dkt. No. 245, Exhibit 12). Though Defendants contend this term was intended to convey the stage Lacaillade hoped the product would eventually reach rather than the stage it had in fact attained as of June and July 2024, Lacaillade's testimony appears to be using that term to describe the tool's "earlier version." (*Id.*) Moreover, Hotz states that he reviewed the code base in July 2024 and found a high level of functionality, even if he cannot say it precisely met the MVP level. Also, the parties agree that "by July 19, 2024, Defendants were able to use artificial intelligence ('AI') to extract data with 95% accuracy from a few dozen shipping documents provided to them a week earlier by Freightmate's first design partner." (Dkt. No. 249-1.) In combination, that is sufficient factual foundation for Hotz's opinion to be helpful for the jury and to be more probative than unfairly prejudicial.

***Motion in Limine No. 3 re Trade Secret Identification***: Rule 37(c) permits exclusion of evidence at trial that a party was required to disclose or supplement in fact discovery, but failed to, unless the failure was "substantially justified or is harmless." Defendants state that Flexport is now claiming items as trade secrets that it was required to disclose in response to Interrogatory No. 1, either as an initial matter or in its supplementation, yet failed to. As an initial matter, Defendants may properly seek to exclude such information from the trial via a motion in limine under Rule 37(c). Flexport contends that it was not required to supplement Interrogatory No. 1 with the information at issue because Defendants learned the same information in Rule 30(b)(6) depositions. To substitute for Flexport's required interrogatory response, such deposition testimony would need to be clear that these additional components were part of the trade secrets claimed in this litigation. The Court requested that Flexport explain at the pretrial conference

which documents it intends to claim as trade secrets were undisclosed in the interrogatory answer and whether those documents were disclosed in deposition testimony. At the pretrial conference, Flexport stated that it wished to include "14 to 18" additional shipping documents within Trade Secret 8, and that it had responded to another interrogatory saying these additional documents were included in those taken by Zhao when he misappropriated Trade Secret 8. But that did not disclose those 14 to 18 shipping documents to be among the trade secrets claimed. It only disclosed that those documents were taken together with alleged trade secret materials. Nor has Flexport carried its burden to show this failure was harmless. Freightmate stated that it has paid experts to review the trade secrets as listed in Interrogatory No. 1, not the revised list including these additional shipping documents.

***Motion in Limine No. 4 to Exclude McDuff Opinion re Trade Secret Damages***: Denied. Hotz's report and testimony about Trade Secret No. 6 provides sufficient foundation for McDuff's opinion. Hotz opined that the information behind the Workflow Secrets allowed Freightmate to accelerate its development timeline such that it completed what would normally take six months in only one month. Given the broad-ranging nature of the processes claimed in Trade Secret No. 6, and Hotz's explanation in his report of why the Workflow Secrets would be so critical to the various workstreams of product development, that gave McDuff a sufficient basis to consider the assumption of a five-month head start based on the use of Trade Secret No. 6. It does not matter that Hotz analyzed the impact of the information behind Workflow Secrets and did not specifically call those "trade secrets" or describe his analysis at deposition as apportioning the head start provided by each individual "trade secret." That is a distinction of form rather than substance. Nor is there a basis to exclude McDuff's analysis of Trade Secret 6 damages because it includes an alleged head start in the development of frontend and UX components, which Defendants say would only be pertinent to Trade Secret No. 4 but Flexport contends would still have taken longer without Trade Secret No. 6. Hotz's report specifically discusses the interrelated nature of the Workflow Secrets and various components of the product, including frontend and UX components such as "user-facing dashboards." That is sufficient.

Likewise, as to Trade Secret No. 8, McDuff has sufficient factual foundation based on Kay's opinion that it would take "at least one year" to develop a set of documents comparable to Flexport's shipping datasets. Though Kay's deposition testimony contains some potentially contrary statements, he testified at page 300 that building Docmate would have taken "easily like a year's worth of work" without the Flexport materials allegedly taken. (Dkt. No 245, Exhibit 4). Whether that deposition testimony contradicts rather than merely clarifies Kay's earlier testimony is an issue for the jury to determine and goes to weight rather than admissibility.

***Motion in Limine No. 5 to Exclude Expert Testimony Beyond the Scope of Rule 26 Reports***: Denied. It is understandable that Flexport did not view the expert declarations about the spoliation issues as within the scope of the Rule 26(a)(2)(A) disclosures required for their experts' trial testimony, since they were submitted in support of the Rule 37(e) spoliation motion only. Moreover, even if Rule 26 required their earlier disclosure because Defendants seek as a sanction the ability to present this evidence of spoliation, such failure was substantially justified for the same reason and was also harmless because Defendants had sufficient opportunity to depose all the experts regarding the topics at issue.

***Motion in Limine No. 6 to Exclude McDuff's Reasonable Royalty Testimony***: Granted as to the RoyaltySource summary in Paragraph 92 and otherwise denied. McDuff does not provide a sufficient basis to treat the software royalties in the RoyaltySource summary as economically or technically comparable to the hypothetical negotiation at issue. *See ResQNet.com, Inc. v. Lansa, Inc*., 594 F.3d 860, 870 (Fed. Cir. 2010). Flexport argues that McDuff is only using the RoyaltySource summary as a "cross check," but there is no basis for using non-comparable licensing information as a comparator to justify the rate. Though a reasonable royalty analysis is flexible in trade secret cases, the hypothetical negotiation must still be tied to the specific facts of the case. Accordingly, the RoyaltySource summary is properly excluded. However, McDuff's report bases his calculation of the reasonable royalty rate on a variety of factors beyond the RoyaltySource summary, so the remainder is properly admitted under Rule 702.

The remaining issues raised by Defendants go to weight and not admissibility. McDuff states that his opinion that a hypothetical negotiation would culminate in a 50/50 split of his calculated profit margin is based on various factors, including Freightmate's market position, the significance of Docmate to its overall strategy of market entry, and the importance of the trade secrets at issue to Docmate. That is not an unexplained rule of thumb automatically applying a 50/50 split. McDuff also has sufficient foundation for selecting the comparator companies for his calculation of profit margins, based on Freightmate documents indicating that those companies were potential future competitors whose profit margins it sought to emulate. Similarly, McDuff's proposal does not appear to involve Freightmate transferring its entire profit margin (or its entire revenue, for that matter) to Flexport, but instead splits those profits. Though McDuff places a cap on the total amount that could be paid which would be in the same amount as the alleged unjust enrichment, that is a maximum amount, not a minimum, and Freightmate might never reach it. To the extent that Freightmate believes such a deal would be a poor one because it provides so few benefits to Freightmate if its business succeeds, that is an issue for cross-examination, not a basis for excluding McDuff's testimony.

***Motion in Limine No. 7 re Counsel's Military Service***: Granted in part. There shall be no irrelevant references to military service by either side. An unobtrusive lapel pin to which counsel does not call attention is not a "reference to military service," though an ostentatious or over-the-top display of insignia or the like would be. The motion is otherwise denied.

## III. ORDERS REGARDING WITNESSES

Except for parties, witnesses are excluded from the courtroom except when testifying. Counsel shall inform witnesses of all motion in limine rulings.

## IV. MATTERS RESERVED FOR COURT RATHER THAN JURY

The parties' Joint Pretrial Conference Statement identifies issues that they agree are reserved to the Court. The Court is in agreement that these issues are to be tried to the Court rather than the jury and will plan to schedule further remedy proceedings accordingly if necessary.

With respect to both reasonable royalty under the CUTSA and exemplary damages under the CUTSA and the DTSA, the Court agrees with Judge Freeman's thorough analysis of both issues in *Palantir Techs. Inc. v. Abramowitz*, 639 F. Supp. 3d 981 (N.D. Cal. 2022). Both issues are reserved for jury determination.

With respect to unjust enrichment under the DTSA and CUTSA, the Federal Circuit's reasoning in *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304 (Fed. Cir. 2018), is persuasive. Disgorgement is not a remedy historically available at law, so there is no basis for jury determination of that remedy. However, in light of the unsettled nature of the issue, the Court will seek the jury's view of the amount of any unjust enrichment award on the verdict sheet, with the option of determining later whether that verdict is merely advisory. *See Medidata Sols., Inc. v. Veeva Sys., Inc.*, No. 17 CIV. 589 (LGS), 2022 WL 585726, at *2 (S.D.N.Y. Feb. 25, 2022).

With respect to the issue of whether Zhao and Lacaillade owed a fiduciary duty to Flexport, this is an issue properly submitted to the jury. No timely motion for summary adjudication was filed on this issue. If Plaintiff believes at the close of evidence that the Court must enter judgment as a matter of law in its favor, it may so move, though the Court may elect to take the matter under submission to be decided after the jury's verdict.

With respect to waiver and unclean hands, equitable affirmative defenses are to be decided by the Court rather than the jury. Defendants do not cite any authority disputing that waiver and unclean hands are equitable defenses rather than a legal ones. Flexport argues that Lacaillade did not plead the factual basis for his unclean hands defense in his answer. But the Federal Rules do not require that. *See Jensen v. Thomas*, No. 23-CV-01628-RFL, 2024 WL 5295012, at *2 (N.D. Cal. Aug. 15, 2024). However, although waiver and unclean hands will be determined by the Court, evidence on those topics will likely remain admissible in the jury trial because it will be cross-admissible on the legal claims submitted to the jury. For example, Flexport's allegedly lackadaisical attitude toward retrieving the documents would likely be pertinent to whether the documents truly constitute trade secrets and the value of those alleged

trade secrets, and its alleged lack of response to information about Lacaillade forming a new venture would likely be pertinent to whether his actions in that phase actually damaged Flexport for purposes of its breach of contract and fiduciary duty claims. Flexport has not identified any evidence that would be admissible solely as to the waiver and unclean hands defenses or would violate Rule 403 for the jury to hear if it is not deciding those. Accordingly, because Flexport has given no good reason to bifurcate the evidence presentation on these defenses, the Court intends to hear the evidence presented in the jury trial and then enter its determination after the jury trial is completed if the jury returns applicable verdicts in favor of Flexport.

With respect to California Business & Professions Code Section 16600, Washington law applies. California is the forum state, so its choice of law principles govern. California law reflects a strong public policy favoring enforcement of choice-of-law clauses and will generally enforce the parties' choice of law, so long as the chosen state has a substantial relationship to the parties or their transaction, as it does here. *Washington Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 916 (Cal. 2001). The agreements at issue state that Washington law governs, and Lacaillade and Zhao worked for Flexport in Washington and resided there during their employment at issue. To override that, Lacaillade and Zhao would have to show that the choice of Washington law is "contrary to the fundamental policy" of California *and* that California "has a materially greater interest in the determination of the particular issue" than Washington. *Id.* at 917. Though California may have a fundamental policy interest in employee mobility and its companies' ability to openly compete for employees, this interest does not appear "materially greater" than Washington's interest in protecting its companies' ability to control their proprietary information with respect to employees who lived in Washington and worked at a Washington office. *See DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 423 (1st Cir. 2024) (analyzing a similar situation under Massachusetts law, which applies the same test). Thus, the Court does not intend to instruct the jury as to this defense. Defendants may re-raise this issue in the jury instructions conference at the close of evidence if the evidence presented at trial shows a reason why California's interest would be materially greater than Washington's.

## V. STIPULATIONS AND JUDICIAL ADMISSIONS

The parties shall prepare and file a list of stipulated facts to be marked as a trial exhibit and provided to the jury in its deliberations. This list shall be included with the parties' other trial exhibits.

As to disputed facts that Plaintiff contends are judicially admitted, Plaintiff shall prepare a list of verbatim admissions directly quoted from the answers or filings by Defendants, and provide them to Defendants, by September 18, 2026.[1] Defendants shall identify any additional portions to be included under Rule 106 because the existing quotation will create a misimpression without the additional portion by September 22, 2026. The parties shall then meet and confer to arrive at an agreement as to which portions shall be included, and what limiting instruction shall be given, if any, to the jury about applying the admission to other defendants. The parties shall also meet and confer about any relevance or Rule 403 objections, though it appears to the Court on its initial review that most of the facts listed appear to be relevant and admissible under Rule 403. The parties shall submit the list of admissions and any proposed limiting instructions by September 29, 2026. To the extent that the parties cannot reach agreement, they shall submit a joint letter of no more than 10 pages, with a maximum of three bellwether examples on which a ruling is requested, by September 29, 2026.

As to the stipulations that Flexport asserts Defendants failed to honor, Flexport is correct that no discovery motion is needed to establish an admission. However, the deposition transcript and subsequent email corroborate Defendants' account that the parties agreed that Defendants were not required to respond to the Requests for Admission at issue because the topics were adequately covered by Zhao's deposition testimony. The agreement also appears to cover all four sets of Requests for Admissions, totaling approximately 400, that were sent to all three defendants. At the pretrial conference, Flexport requested that the Court require Defendants to stipulate to a series of seven facts described in Zhao's deposition testimony. The agreement, as

[1] This deadline was included in the tentative order, and Plaintiff did not object. If Plaintiff has not met this deadline already, it must comply with it as soon as possible.

memorialized at the deposition, does not involve such a requirement, and the Court therefore declines to impose it.

The parties may request that the Court read the stipulated facts to the jury during trial. The time spent to read these facts will be charged to the requesting party or, if both sides request it, will be split evenly.

## VI. JURY INSTRUCTIONS

A chart is attached as Exhibit A with rulings on the jury instruction disputes. A redlined version of the parties' proposed instructions that includes the Court's modifications (as described in the tentative rulings) is attached as Exhibit B. The Court intends to further review and revise the instructions during the course of the trial and will provide a further version of the proposed jury instructions prior to the final instructions conference, which will take place after the close of evidence.

## VII. JURY SELECTION

The Court's additions to the standard civil jury questionnaire, which closely correspond to the parties' proposal, are attached as Exhibit C.

The jury selection process will proceed as follows: Nine jurors will be seated. Plaintiff will have a total of three peremptory challenges. Defendants will also have a total of three peremptory challenges shared between them. Jury selection will be conducted as a 20-pack. The Court will complete initial questioning of the first group of 20. Each side will then have 20 minutes to voir dire that group, beginning with Plaintiff. Defendants will share their 20 minutes, given the alignment of interests. Cause challenges will be discussed at sidebar, and then those jurors will be excused before peremptories. When there are seven jurors left in the box, the remaining slots will be filled from the gallery. The Court will question the new jurors, after which each side will have 7 minutes for additional voir dire, before proceeding to cause and peremptory challenges. The Courtroom Deputy will provide a two-minute warning to counsel.

## VIII. SEALING

Generally, the parties' submission does not meet the compelling interest standard for

closing the courtroom. Instead, most of the testimony described could be conducted using shorthand (e.g., "Trade Secret No. 1") or using a procedure that keeps sealed exhibits from being publicly displayed to the audience and displays them only to the witness, counsel, and jurors. The court is not inclined to seal the courtroom for those purposes, absent a further specific showing.

If a sealed exhibit is used during examination, examining counsel shall be responsible for turning off or turning around the courtroom screens to avoid disclosing the information, and shall confer with the courtroom deputy in advance to understand how to do so. Counsel shall also inform witnesses to avoid reading sealed information out loud during the witness preparation process.

## IX. JOINT SUBMISSION OF TIMELINE

In order to allow the Court to rule more efficiently and effectively on evidentiary issues during trial, the parties shall file jointly a timeline of key events for the Court's use during trial. Color coding or other notations may be used to indicate if the occurrence or timing of particular events is contested.

The parties are also encouraged to create a stipulated version of a binder for the jurors with the alleged trade secrets and timeline to be provided after opening statements. The parties shall be responsible for preparing copies of any such binders for the jury and for ensuring that both sides have had an opportunity to review its accuracy.

## X. TRIAL SCHEDULE

- 9/22/2026: Supplemental pretrial filings due:
  - Flexport shall file new forms of the stipulated jury instructions that eliminate references to actual loss damages (including sending Word copies to the proposed order inbox), after providing Defendants an opportunity to review them and raise any objections.
  - Flexport shall provide its position that it proposes to insert into Instruction No. 64.

  - After meeting and conferring, the parties shall submit a proposed neutral, accurate description of the alleged trade secrets to attach to proposed Instructions Nos. 57 and 87 based on Flexport's interrogatory response.
  - Joint letter stating name of mediator and date scheduled for mediation due.
- 9/29/2026: Further supplemental pretrial filings due:
  - Joint list of admissions and any proposed limiting instructions, or letter raising disputes as to the admissions and limiting instructions, due.
  - Joint timeline of events for the Court's use (and, if agreed upon, binders with timelines and other materials for the jury's use too), as described above.
  - Stipulated version of Jury Instruction Nos. 112-114, and verdict form, or if no agreement can be reached, joint filing of 8 pages or less (total) regarding competing proposals.
  - Briefing on the appropriateness of restitution damages for breach of contract and the appropriate instruction language under Washington law, joint filing of 8 pages or less (total).
  - Revised proposed verdict form(s), ideally one stipulated proposed form, in a joint submission.
  - Proposed order with sealing table for motions in limine
- 10/8/2026: Last day for jury office to send the parties copies of the completed jury questionnaires (may be earlier if the jury office receives the full set earlier).
- 10/9/2026: Mediation deadline
- 10/12/2026: Joint status update regarding mediation
- 10/13/26 at 1:30 p.m. via Zoom. Excusal hearing to discuss stipulations to excuse jurors based on questionnaires for cause and the Court's decisions to dismiss jurors for hardship. The Court will also rule on disputes from the 9/22/26 and 9/29/26 filings, if necessary.

- 10/14/26: Joint trial exhibits due, including a list of stipulated facts to be marked as a trial exhibit and provided to the jury in its deliberations.
- 10/16/26: Jury selection at 9:00 a.m., counsel to arrive by 8:00 a.m. to discuss any final issues. Court will give preliminary instructions to empaneled jury before sending them home.
- 10/19/26 through 10/23/26: Counsel arrives 8:00 a.m. to discuss any issues and to pre-admit stipulated exhibits. Trial begins at 8:30 a.m., beginning with opening statements (45 minutes for Plaintiff; 30 minutes for Defendants Freightmate and Lacaillade; 15 minutes for Defendant Zhao). Court finishes for the day at 1:30 p.m. Fifteen-minute breaks around 10 a.m. and 11:45 a.m. Anticipate completing all evidence by 10/23/26. Final instructions conference to be held at 2:30 p.m., or earlier if evidence closes earlier. All deadlines in the Civil Trial Standing Order regarding the first day of trial run from 10/19.
- 10/26/26: Anticipated closing jury instructions, followed by closing arguments (90 minutes for Plaintiff; 70 minutes for Defendants Freightmate and Lacaillade; 20 minutes for Defendant Zhao), but be prepared to complete earlier if evidence finishes earlier.
- I will tell jury that the trial is estimated to run through 10/26/26, but that this time estimate does not include deliberations. We will be dark, including for deliberations, 10/29 through 11/3, because of my unavailability due to other long-scheduled work-related obligations. It seems unlikely that deliberations would continue beyond 11/6, but if that occurs, we will also be dark the week of 11/9, for the same reason.
- Plaintiff will have 10 hours, and Defendants will share a total of 10 hours, for evidence presentation, inclusive of objections and sidebars. Time spent orally arguing evidentiary issues (including at the beginning or close of the trial day and during trial or breaks) will be charged to the losing party, except in unusual

circumstances. This time limit does not include opening statements and closing arguments.

Dated: September 18, 2026

RITA F. LIN
United States District Judge